IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

DAVID BROWN,                      )  Civ. No. 07-00556 ACK-LEK
                                  )
            Plaintiff,            )
                                  )
      vs.                         )
                                  )
STATE OF HAWAI'I, MALANIE         )
CHINEN; NANCY MCMAHON, LAURA      )
THIELEN, AND DOES 1-25,           )
                                  )
            Defendants.           )
                                  )
_____ )

## ORDER:  (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS THE SECOND AMENDED COMPLAINT; AND (2) GRANTING PLAINTIFF THIRTY DAYS LEAVE TO AMEND THE COMPLAINT

### PROCEDURAL HISTORY

On November 7, 2007, Plaintiff, David Brown, filed a complaint in this Court against, inter alios, Melanie Chinen, in her individual capacity and in her official capacity as the administrator of the State Historic Preservation Division ("SHPD") of the Department of Land and Natural Resources ("DLNR"), and the State of Hawai'i ("State") (collectively, "Defendants").  The complaint asserted a number of claims, including:  (1) a 42 U.S.C. § 1983 claim alleging a violation of Plaintiff's First Amendment rights as applicable to the states through the Fourteenth Amendment; (2) a 42 U.S.C. § 1983 claim alleging a violation of Plaintiff's Fourteenth Amendment right to substantive and procedural due process; (3) a federal and Hawai'i

state law claim for negligent management and handling of human remains; (4) a Hawai'i state law claim for negligent hiring, training, and supervision against the DLNR under a theory of respondeat superior; (5) a Hawai'i state law claim for intentional and negligent infliction of emotional distress; (6) a Hawai'i state law claim for defamation; (7) a Hawai'i state law claim for conspiracy to defame; (8) a Hawai'i state law claim for conspiracy to coerce the violation of laws; (9) a Hawai'i state law claim for retaliation; and (10) a claim under the Native American Graves Protection and Repatriation Act ("NAGPRA"), 25 U.S.C. § 3001 <u>et</u> <u>seq.</u>

On February 19, 2008, the State and Chinen, in her official capacity, filed a motion to dismiss.  On February 26, 2008, Chinen, in her individual capacity, filed a motion to dismiss.  On May 14, 2008, this Court granted the motions, dismissing Plaintiff's claims, including his § 1983 claims under the First Amendment against the State and Chinen, in both her individual and official capacities, and his NAGPRA claim. However, this Court granted Plaintiff leave to amend the complaint.

On June 13, 2008, Plaintiff filed a first amended complaint ("First Amended Complaint"), alleging:  (1) a 42 U.S.C. § 1983 First Amendment claim against the State and against Chinen in her individual capacity; and (2) a NAGRPA claim against the

2

State.  On June 27, 2008, Chinen, in her official capacity, and the State filed a motion to dismiss the First Amended Complaint. On July 17, 2008, Chinen, in her individual capacity, filed a motion to dismiss the First Amended Complaint.  On October 9, 2008, Plaintiff filed an opposition to the State and Chinen's motion to dismiss.  The same day, he also filed a memorandum in opposition to the motion to dismiss that Chinen had filed in her individual capacity.

At some point, Chinen left her position with the SHPD. Consequently, on October 10, 2008, Plaintiff filed a motion to amend his First Amended Complaint by adding Nancy McMahon and Laura Thielen as Defendants in their respective official capacities as the current administrator of the SHPD and director of the DLNR.  Attached as exhibit H to the motion is a copy of Plaintiff's second amended complaint ("Second Amended Complaint").  In the Second Amended Complaint, like the first, Plaintiff alleged a 42 U.S.C. § 1983 First Amendment claim against the State and against Chinen in her individual capacity. (2d Am. Compl. at 20.)  But, unlike the First Amended Complaint, the Second Amended Complaint asserted a NAGRPA claim not only against the State, but also against Chinen, Thielen, and McMahon in their official capacities.  (Id. at 25.)

On October 16, 2008, Chinen, in her official capacity, and the State filed a reply to Plaintiff's memorandum in

3

opposition.  On October 17, 2008, Chinen, in her individual
capacity, filed a reply memorandum in support of her motion to
dismiss.

On October 24, 2008, the parties filed a stipulation to
amend Plaintiff's First Amended Complaint.  In light of this
stipulation, this Court entered a minute order on October 24,
2008, permitting Defendants to file supplemental briefing
regarding the motions to dismiss no later than January 5, 2008
and allowing Plaintiff to file a response no later than January
12, 2008.

On January 2, 2009, Chinen, in her individual capacity,
filed a supplemental memorandum regarding her motion to dismiss.
On January 5, 2009, Chinen, in her official capacity, and the
State filed a supplemental memorandum regarding their motion to
dismiss.  On January 12, 2009, Plaintiff filed a combined
supplemental response in opposition to the motions to dismiss.

## FACTUAL BACKGROUND

The facts in this order are recited for the limited
purpose of resolving the motions to dismiss and may not be
construed as findings of fact that may be relied upon in future
proceedings in this case.  Plaintiff's Second Amended Complaint
includes the following factual allegations.

On September 16, 2005, the State hired Plaintiff as the
Branch Chief Archeologist for the SHPD.  (2d Am. Compl. ¶ 21.)

4

Plaintiff's employment with the SHPD ended on June 30, 2006.
(<u>Id.</u> ¶ 83.)  The State chose not to renew his contract because he
voiced his concerns that numerous practices at the SHPD were
unethical, culturally insensitive, or illegally violating
numerous federal laws.  (<u>Id.</u> ¶ 2.)

Plaintiff's job description states that he was
responsible for administering and directing the Archaeological
Branch of the SHPD.  (<u>Id.</u>, Ex. A at 1.)  One of the qualification
requirements for his position was knowledge of state and federal
legislation, rules, and regulations governing the historic
preservation program.  (<u>Id.</u> at 5.)  His position included
administrative, planning, review, and inventory activities.  (<u>Id.</u>
at 2-3.)  In his administrative capacity, he was charged with
initiating, formulating, and recommending policies that affected
the immediate activities of the Archaeological Branch.  (<u>Id.</u>
at 2.)  He also had the obligation of directing investigations
and reviews as well as evaluating and making recommendations for
areas of archaeological importance.  (<u>Id.</u>)  In addition,
Plaintiff had the responsibility of recommending standards and
priorities for historic preservation projects.  (<u>Id.</u>)  In his
planning capacity, Plaintiff was charged with devising a strategy
that systematically prioritized the statewide survey of
archaeological properties and that allowed for more expeditious
decisionmaking during the review process.  (<u>Id.</u>)  He was further

charged with directing Archaeological Branch activities related to the protection and preservation of archaeological areas and to the enforcement of laws and regulations within those areas.  (Id. at 3.)

In his reviewing capacity, Plaintiff was responsible for reviewing and overseeing the archaeological review of conservation district use applications, EIS statements, state clearing house reviews, and other requests to construct, alter, or improve any historic sites as required by state law.  (Id.) He also was required to review and oversee the archaeological review of federal or federally financed or licensed projects for their effect on sites on or eligible for inclusion in the National Register or required by federal regulations.  (Id.) With respect to his inventory duties, Plaintiff was charged with prioritizing, directing, and overseeing the entering of archaeological sites into the statewide inventory of historic properties.  (Id.)  He was required to synthesize previously existing inventory information and to help maintain this inventory for public and governmental use.  (Id.)

While on the job, Plaintiff voiced his objections to numerous procedures that violated legal and ethical obligations when approving or denying archeological approval for projects on numerous occasions.  (2d Am. Compl. ¶ 30.)  To illustrate, on September 28, 2005, Plaintiff voiced his concern to Chinen that

6

the "Superferry" should follow procedure in obtaining approvals and permits, but none of the procedures that he had proposed were followed. (Id. ¶ 30.a.)  Plaintiff also objected when Chinen coerced him into representing her, the SHPD, and the State in the "Walmart" matter. (Id. ¶ 30.b.)  Furthermore, Chinen approved an archeological survey in the "General Growth Properties" project over Plaintiff's objection. (Id. ¶ 30.c.)  During the construction that followed, sixty-five burials were found. (Id.) In addition, Plaintiff advised Chinen not to continue to approve the permit in the "Hokulia" project because of very high density and frequency of archeological resources, but Chinen nevertheless approved the permit. (Id. ¶ 30.d.)  He advised Chinen against approving the "Turtle Bay" project in light of the high probability of finding burials. (Id. ¶ 30.e.)  Chinen responded by preventing Plaintiff from participating any further in the project. (Id.)  The State presently plans to purchase the land for $400 million to protect and preserve it in perpetuity, but it also plans to build at least one more resort. (Id.)  The building of one more resort at Turtle Bay could potentially harm or displace hundreds of Hawaiian burials. (Id.)

On or about May 15, 2005, Plaintiff objected when Chinen directed him to fast-track approval of the grubbing/grading permit in the "Kaloko Heights" project to allow ground-disturbing activities in and around known archeological

features and burial sites in an archeological landscape eligible for inclusion to the National Historic Register. (Id. ¶¶ 30.f, 79.b.) The SHPD had yet to receive or approve the burial treatment plan, preservation plan, and data recovery plan. (Id. ¶¶ 30.f, 79.a) Plaintiff objected because he knew that the grubbing and grading would harm archeological features and Hawaiian burials in violation of principles promoted by the NAGPRA. (Id. ¶ 79.c.) In another matter, Chinen demanded that three archeological surveys be performed to find significant archeological features. (Id. ¶ 30.g.) When none were found and when Plaintiff recommended approval of the permit, Chinen further delayed the project and thereby caused financial harm to the developer. (Id.)

The library of the SHPD was in shambles. (Id. ¶ 39.) Every time Plaintiff attempted to fix the library and records, Chinen told him that it was not a priority. (Id. ¶ 41.) She hindered Plaintiff from fixing the library so that she could engage in fast-tracking and delay tactics. (Id. ¶ 42.) Plaintiff also asked Chinen to start a program whereby bones in SHPD custody would be handled according to museum curatorial standards under the NAGPRA and other federal regulations. (Id. ¶¶ 48, 52.) Chinen replied that handling bones according to museum curatorial standards was not a priority. (Id. ¶ 49.) Plaintiff came to learn that Chinen would falsify NPS Historic

8

Preservation Grant documentation in her efforts to acquire federal dollars for the SHPD. (<u>Id.</u> ¶ 55.)

On or about June 1, 2006, Chinen reprimanded Plaintiff for violating policymaking procedures during a meeting and subsequently refused to renew his contract. (<u>Id.</u> ¶ 56.) She made false, hurtful, and malicious statements about him that she knew to be false. (<u>Id.</u> ¶ 57.) Chinen stated that she had received complaints from all of Plaintiff's staff, the private archaeology community, and the Hawaiian community. (<u>Id.</u>) She further stated that the complaints stemmed from Plaintiff's changing policy single-handedly and inconsistent application of those changes. (<u>Id.</u>) Chinen subsequently drafted a memo to Plaintiff's file detailing the conversation. (<u>Id.</u>, Ex. B.) Plaintiff's contract with SHPD expired on June 30, 2006. (2d Am. Compl. ¶ 83.)

On or about April 20, 2007, Chinen made false, hurtful, and malicious statements about Plaintiff that she knew to be false to the Honolulu Advertiser. (<u>Id.</u> ¶ 59.) The statements were similar to her June 1, 2006 comments. (<u>Id.</u>) On August 9, 2007, in an interview with the Hawaii Tribune Herald, Chinen stated that she did not renew Plaintiff's contract because she was looking for "a better match for the requirements of the job." (<u>Id.</u> ¶ 66.) Moreover, during her interview, Chinen explained that Plaintiff's "statements are absolutely false, . . . that

[she] was greatly offended," and that "[Plaintiff] had been accusing [her] of things even when [Plaintiff] was employed [by the SHPD]." (<u>Id.</u>)  She further stated that the "[SHPD] always had rules whether [Plaintiff] agrees with them or not." (<u>Id.</u>)

Plaintiff spoke out about principles of federal law that must be observed to Chinen, to his fellow workers at the SHPD, to those he related with in the professional archeological community, and with members of the community, as indicated in paragraph 30 of the Second Amended Complaint. (<u>Id.</u> ¶ 89.)  That paragraph outlines Plaintiff's communications with Chinen that are discussed above regarding the Superferry, Walmart, General Growth Properties, Hokulia, Turtle Bay, Kaloko Heights, and the three delayed development approvals. (<u>Id.</u> ¶ 30.)  With respect to the Superferry, Plaintiff alleges that, on September 28, 2005, as documented in exhibit D to the Second Amended Complaint, he voiced his concern to Chinen that the Superferry should follow procedure in obtaining approvals and permits. (<u>Id.</u> ¶ 30.a.)  Exhibit D includes notes from a meeting regarding Kawaihae Harbor that appear to have been prepared by a state legislator. (<u>Id.</u>, Ex. D at 3.)  The notes reflect that, at the meeting, Plaintiff stated:

> While no harbor plans, road plans, signage, []or parking plans for the Superferry have been reviewed by the [Archaeological] Branch so far, the [SHPD] will be actively involved with determining preservation measures for archaeological

> sites in the development area such as heiaus.
> The area should be resurveyed because the
> current report is over ten years old, and
> many archaeological discoveries have been
> made in the past ten years.

(_Id._ at 6.)  Plaintiff also noted his desire for involvement by

the Department of Hawaiian Home Lands and the various Hawaiian

associations in the area.  (_Id._ at 5-6.)

Plaintiff told Robert Matsuda, an official at the DLNR,

about "illegal activity" during Plaintiff's union grievance

period, but Matsuda did nothing to remedy the situation.  (2d Am.

Compl. ¶ 96, 104.)  Plaintiff also often confided with his

friend, Dr. John Peterson, a former member of the advisory

counsel on Historic Preservation, to seek counsel on what he

should do about the illegal activity within the SHPD.  (_Id._

¶ 98.)  He additionally confided in many friends, many of whom

had professional qualifications, for advice about what to do in

response to the illegal activities at the SHPD.  (_Id._ ¶ 99.)  At

some point, Plaintiff told Chinen that he would speak out against

the illegal practices of the SHPD and he eventually did so before

the state legislature.  (_Id._ ¶ 90.)

## **STANDARDS**

## I.  **Motion to Dismiss for Lack of Subject Matter Jurisdiction**

A court's subject matter jurisdiction may be challenged

under Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)").

"A party invoking the federal court's jurisdiction has the burden

11

of proving the actual existence of subject matter jurisdiction."
See Thompson v. McCombe, 99 F.3d 352, 353 (9th Cir. 1996).

On a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, the court is not "restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction." McCarthy v. United States, 850 F.2d 558, 560 (9th Cir. 1988). "Once the moving party [converts] the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." Savage v. Glendale Union High Sch., 343 F.3d 1036, 1040 n.2 (9th Cir. 2003).

"The requirement that the nonmoving party present evidence outside his pleadings in opposition to a motion to dismiss for lack of subject matter jurisdiction is the same as that required under Rule 56(e) that the nonmoving party to a motion for summary judgment must set forth specific facts, beyond his pleadings, to show that a genuine issue of material fact exists." Trentacosta v. Frontier Pac. Aircraft Indus., Inc., 813 F.2d 1553, 1559 (9th Cir. 1987). When ruling on a jurisdictional motion involving factual issues which also go to the merits, the moving party "should prevail only if the material jurisdictional

12

facts are not in dispute and the moving party is entitled to prevail as a matter of law." Casumpang v. Int'l Longshoremen's & Warehousemen's Union, 269 F.3d 1042, 1060-61 (9th Cir. 2001).

## II.  Motion to Dismiss for Failure to State a Claim Upon Which Relief Can be Granted

Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") permits dismissal of a complaint that fails "to state a claim upon which relief can be granted."  Under Rule 12(b)(6), review is generally limited to the contents of the complaint. Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001); Campanelli v. Bockrath, 100 F.3d 1476, 1479 (9th Cir. 1996).  Courts may also "consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003). Documents whose contents are alleged in a complaint and whose authenticity are not questioned by any party may also be considered in ruling on a Rule 12(b)(6) motion to dismiss.  See Branch v. Tunnell, 14 F.3d 449, 453-54 (9th Cir. 1994).

On a Rule 12(b)(6) motion to dismiss, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party.  Fed'n of African Am. Contractors v. City of Oakland, 96 F.3d 1204, 1207 (9th Cir. 1996).  However, conclusory allegations of law, unwarranted

deductions of fact, and unreasonable inferences are insufficient to defeat a motion to dismiss.  See Sprewell, 266 F.3d at 988; Nat'l Assoc. for the Advancement of Psychoanalysis v. Cal. Bd. of Psychology, 228 F.3d 1043, 1049 (9th Cir. 2000); In re Syntex Corp. Sec. Litig., 95 F.3d 922, 926 (9th Cir. 1996).  Moreover, the court need not accept as true allegations that contradict matters properly subject to judicial notice or allegations contradicting the exhibits attached to the complaint.  Sprewell, 266 F.3d at 988.

In summary, to survive a Rule 12(b)(6) motion to dismiss, "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007) (internal citations and quotations omitted).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Id. at 1964 (internal citations and quotations omitted).  Dismissal is appropriate under Rule 12(b)(6) if the facts alleged do not state a claim that is "plausible on its face."  Id. at 1973.

## DISCUSSION

I.   **Plaintiff's First Amendment Retaliation Claims**

In count I of the Second Amended Complaint, Plaintiff alleges a 42 U.S.C. § 1983 claim under the First Amendment against Chinen, in her individual capacity, and the State.[1]   (2d Am. Compl. at 20.)   Plaintiff asserts that the State's decision not to rehire him was punishment for his speaking out against illegal, unethical, and culturally insensitive practices and that the decision violated his right to freedom of speech under the First Amendment.   (2d Am. Compl. ¶¶ 86, 100, 107.)   Chinen, in both her official and individual capacities, and the State have moved to dismiss count I of the Second Amended Complaint.   It appears, however, that the count I does not assert a claim against Chinen in her _official_ capacity.   (_Id._ at 20.)   As such, this Court denies Defendants' motion to the extent that it seeks dismissal of count I as it applies to Chinen in her official capacity.   This Court will now address count I as it applies to the State and Chinen in her individual capacity.

_____

[1]/ To state a claim under 42 U.S.C. § 1983, a plaintiff must allege:   (1) a violation of a right secured by the Constitution and laws of the United States; and (2) that the deprivation was committed by a person acting under color of law.   _See_ _West v. Atkins_, 487 U.S. 42, 48 (1988).   There is no issue here as to whether Plaintiff has sufficiently alleged that Chinen was acting under color of law.   As discussed below, the question is whether Plaintiff has sufficiently pled that his First Amendment rights were violated.

Before considering the parties' contentions in the present proceeding, it is instructive to review the outcome of the first round of motions to dismiss.  With respect to the State and Chinen, who at the time was the administrator of the SHPD, this Court determined that the they were immunized from Plaintiff's § 1983 claims by virtue of the Eleventh Amendment insofar as Plaintiff sought monetary or retrospective relief. (Order Granting Defs.' Mots. to Dismiss 13.)  Although the claims for prospective relief were not barred (id.), this Court nevertheless dismissed Plaintiff's First Amendment retaliation claim under § 1983 against the State and its officials, because Plaintiff had failed to allege that he engaged in constitutionally protected speech (id. at 20-21).  As to Chinen in her individual capacity, this Court dismissed Plaintiff's First Amendment retaliation claim under § 1983, similarly because he failed to allege that he had been deprived of a federal right. (Id. at 30.)  This time around, the State and Chinen, in her individual capacity, once again assert that Plaintiff has failed to plead certain essential elements of a First Amendment retaliation claim.  Chinen, in her individual capacity, additionally contends that she is entitled to qualified immunity. This Court will first discuss the First Amendment retaliation issues and then consider the question of qualified immunity.

16

**A.    First Amendment Retaliation**

Public employees suffer a constitutional violation when they are wrongfully terminated or disciplined for making protected speech.  See Marable v. Nitchman, 511 F.3d 924, 929 (9th Cir. 2007).  To prove retaliation in violation of the First Amendment, "an employee must show (1) that he or she engaged in protected speech; (2) that the employer took 'adverse employment action'; and (3) that his or her speech was a 'substantial or motivating' factor for the adverse employment action." Coszalter v. City of Salem, 320 F.3d 968, 973 (9th Cir. 2003); see also Marable 511 F.3d at 929.  The State contends that Plaintiff has not adequately pled the first element under Coszalter, asserting that he has not alleged any constitutionally protected speech under the First Amendment.  (Defs.' Mem. in Supp. of their Mot. to Dismiss 4.)  In addition to advancing that argument, Chinen, in her individual capacity, also maintains that Plaintiff has failed to allege the third element under Coszalter, because he does not sufficiently state that his speech was a substantial or motivating factor for the adverse employment action.  (Chinen's Mem. in Supp. of her Mot. to Dismiss 5.)

To elaborate on the first element under Coszalter, an employee's speech is only protected if he spoke "as a citizen upon matters of public concern" rather than "as an employee upon matters only of personal interest." Thomas v. City of Beaverton,

17

379 F.3d 802, 808 (9th Cir. 2004) (quoting <u>Roe v. City of San Diego</u>, 356 F.3d 1108, 1112 (9th Cir. 2004)); <u>see also</u> <u>Connick v. Myers</u>, 461 U.S. 138, 146–47 (1983).   "'Statements are made in the speaker's capacity as citizen if the speaker had no official duty to make the questioned statements, or if the speech was not the product of performing the tasks the employee was paid to perform.'"   <u>Eng v. Cooley</u>, No. 07-56055, 2009 U.S. App. LEXIS 577, at *22 (9th Cir. Jan. 14, 2009) (quoting <u>Posey v. Lake Pend Oreille Sch. Dist. No. 84</u>, 546 F.3d 1121, 1127 n.2 (9th Cir. 2008)).   "While 'the question of the scope and content of a plaintiff's job responsibilities is a question of fact,' the 'ultimate constitutional significance of the facts as found' is a question of law."   <u>Id.</u> at *23 (quoting <u>Posey</u>, 546 F.3d at 1129–30).   In evaluating whether a plaintiff spoke as a private citizen, this Court must assume the truth of the facts as alleged by Plaintiff with respect to his employment responsibilities.   <u>Cf. id.</u> at *2, *23 (addressing whether the defendants were entitled to qualified immunity in the plaintiff's § 1983 First Amendment retaliation case in an interlocutory appeal, the standard of review of which required the Ninth Circuit to assume that the employee's version of the material facts was correct).   If the allegations demonstrate an official duty to utter the speech at issue, then the speech is unprotected.   <u>Cf. id.</u> at *23.

In <u>Garcetti v. Ceballos</u>, 547 U.S. 410 (2006), the plaintiff, Richard Ceballos, was a calendar deputy in the Los Angeles County District Attorney's Office.  A defense attorney contacted Ceballos about inaccuracies in an affidavit used to obtain a search warrant and asked that Ceballos review the case. <u>Id.</u> at 413-14.  After an investigation, Ceballos determined that the affidavit contained misrepresentations and wrote a disposition memorandum to his superiors recommending that the case be dismissed.  <u>Id.</u> at 414.  Ceballos's supervisors decided to proceed with the prosecution despite his concerns.  <u>Id.</u>  As a result, Ceballos was asked to testify for the defense regarding his disposition memorandum.  <u>Id.</u> at 414-15.  When Ceballos was reassigned, transferred and denied a promotion, Ceballos sued his employer and supervisors for violation of his First Amendment right by retaliating against him for writing the disposition memorandum.  <u>Id.</u> at 415.  The Supreme Court held that "[s]o long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively."  <u>Id.</u> at 419 (citing <u>Connick</u>, 461 U.S. at 14).  Moreover, the Supreme Court explained that where an employee speaks pursuant to his official duties, the speech is not protected.  <u>Id.</u> at 421.  Therefore, Ceballos's speech did not

19

qualify as "protected speech" because his disposition memorandum was written pursuant to his official duties.  Id.

In Freitag v. Ayers, 468 F.3d 528 (9th Cir. 2006), cert. denied, 127 S. Ct. 1918 (2007), Deanna Freitag, a former correctional officer for the California Department of Corrections and Rehabilitation ("CDCR"), sued several CDCR administrators claiming they retaliated against her for engaging in constitutionally protected speech.  During her employment with the CDCR, Freitag submitted several incident reports detailing numerous encounters with inmates engaging in sexual exhibitionist behavior.  Id. at 533-534.  The CDCR had allegedly disregarded Freitag's complaints.  Freitag complained to her prison warden, wrote letters to an associate warden and the director of the CDCR, complaining that her reports of inmate misbehavior were being ignored.  Id. at 533.  Freitag also complained to a California State Senator, who contacted the California Office of the Inspector General to initiate an investigation.  Id. at 535.  Alleging that she suffered adverse employment actions motivated by her communications, Freitag brought her First Amendment claim. Id.  Applying Garcetti, the Ninth Circuit held that the communications with the California State Senator were protected under the First Amendment, but that the internal reports were communications that were not constitutionally protected.  Id. at

545.  Specifically, the internal complaints were made "pursuant
to [Freitag's] official duties" as a correctional officer.  Id.

        In Marable, 511 F.3d 924, Ken Marable, an engineer for
the Washington State Ferries ("WSF"), observed and reported
corrupt practices of WSF management participating in overtime and
"special projects" schemes to supplement their pay.  Id. at 927.
Specifically, Marable complained to the Chief Executive Officer
of the WSF, had two conversations about the corrupt practices
with an outside auditor, and complained to a state ethics board.
Id.  Marable alleged that as a result of his complaints,
disciplinary action was taken against him.  Id.  The Ninth
Circuit noted that "an employee's charge of high level corruption
in a government agency has all the hallmarks that we normally
associate with constitutionally protected speech."  Id. at 932.
Interpreting Freitag, the court in Marable explained that "the
conclusion that Freitag's preparation of internal forms was
pursuant to her official duties was not reached merely because
these forms were internal."  Id.  Instead, the court explained,
part of Freitag's job was to critique inmates.  The distinction
between the unprotected comments made in Freitag and the
protected comments made in Marable is that, in Marable, the
plaintiff's complaints related to his superiors' "corrupt over
payment schemes" which fell outside his official duties.  Id.

In <u>Posey</u>, 546 F.3d 1121, Robert Posey was employed as a security specialist to a high school. <u>Id.</u> at 1123–24. Before 2002, Posey was responsible for twenty enumerated tasks relating to preventing and responding to student misconduct. <u>Id.</u> at 1124. But, in 2002, his job responsibilities were reduced to assisting with security and crime prevention and supervising the school parking lot, grounds, and hallways. <u>Id.</u> at 1125. He was no longer responsible for liaising with police, enforcing truancy policies, searching students, or investigating student misconduct. <u>Id.</u> In 2003, Posey wrote a lengthy letter to the school district chief administrative officer, Steve Battenschlag, complaining about what he perceived to be inadequate safety and security policies at the high school. <u>Id.</u> at 1124. He wrote the letter at home, with his own resources, on his own time, and of his own initiative. <u>Id.</u> The letter was written on plain paper and casually addressed to "Steve." <u>Id.</u> In addition, Posey's workplace resources were inconsistent with his having written the letter with school resources. <u>Id.</u> Posey's job was subsequently eliminated, which prompted him to file a First Amendment retaliation claim against the school district. <u>Id.</u> at 1123. The district court granted summary judgment in favor of the school district, concluding as a matter of law that the letter in question had been written pursuant to Posey's job responsibilities and thus in his capacity as a public employee.

22

Id.  The Ninth Circuit reversed and remanded, concluding that the pleadings and evidence in the case presented genuine issues of material fact regarding the scope and content of Posey's job responsibilities.  Id. at 1129.

In this case, Plaintiff alleges that the State did not renew his employment contract because he voiced his opinion that numerous practices at the SHPD were unethical, culturally insensitive, or illegally violating numerous federal laws.  (2d Am. Compl. ¶ 2.)  Plaintiff maintains that, as the Chief Branch Archaeologist, he was not responsible for monitoring his supervisor, Chinen, to ensure that she did not violate federal laws.  (Id. ¶ 34.)  But he was responsible for administering and directing the Archaeological Branch of the SHPD.  (Id., Ex. A at 1.)  His duties included administrative, planning, review, and inventory activities.  (Id. at 2-3.)  The numerous objections to his immediate supervisor's decisions were plainly made in connection with one or more of those activities while he was on the job.  (Compare 2d Am. Compl. ¶¶ 30, 41, 48, 52, 79 with id., Ex. A at 1-3.)  For example, in the "Kaloko Heights" project, Plaintiff objected when Chinen directed him to fast-track approval of the grubbing/grading permit.  (2d Am. Compl. ¶¶ 30.f, 79.b.)  Plaintiff's recommendations against granting the permit to his immediate supervisor were made while he was on the job and as part of his administrative and review responsibilities.  (See

23

<u>id.</u>, Ex. A at 2-3.)  Like the complaints in <u>Freitag</u> and the disposition memorandum in <u>Garcetti</u>, Plaintiff's objections to Chinen were directly related to his official duties as the Branch Chief Archeologist.

Plaintiff asserts that his objections to Chinen were not like the complaints in <u>Freitag</u>, but instead like the reports of corrupt practices in <u>Marable</u>.  (Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss 16.)  He maintains that he objected to Chinen's systematic, "corrupt" practice of fast-tracking development projects in violation of federal law.  (<u>Id.</u>)  To review, in <u>Marable</u>, it was held that the ferry engineer had no official duty to report corrupt practices of WSF management participating in overtime and special projects schemes to supplement their pay. 511 F.3d at 932.  By contrast, in this case, Plaintiff, as the Branch Chief Archeologist, was responsible for reviewing development projects and making recommendations in accordance with state and federal laws governing the historic preservation program.  (2d Am. Compl. ¶ 30, 41, 48, 52, 79; <u>id.</u>, Ex. A at 2-3.)  His objections to what he perceived to be unwarranted or premature development approvals by his immediate supervisor were thus made pursuant to his official duties.  It is for that reason that this case differs from <u>Posey</u>, where there was a factual dispute as to whether the security specialist's employment responsibilities included making policy

24

recommendations.  Here, the allegations in the Second Amended Complaint demonstrate that Plaintiff had an official duty to voice his objections to Chinen, and that speech is therefore unprotected by the First Amendment.  Cf. Eng, 2009 U.S. App. LEXIS 577, at *23.

Aside from raising his objections with Chinen, Plaintiff also voiced his opinion to a number of other individuals, including Robert Matsuda, a DLNR official.  (2d Am. Compl. ¶¶ 8, 96, 104.)  He spoke to Matsuda regarding illegal activity during his union grievance period.  (Id. ¶ 96.)  Chinen seems to assert that Plaintiff's statement to Matsuda was made pursuant to his job responsibilities, because Matsuda was within Plaintiff's chain of command at the DLNR.  (Chinen's Mem. in Supp. of her Mot to Dismiss 16.)  Yet the Second Amended Complaint does not disclose Matsuda's official position; it only implies that he was an official at the DLNR.  (2d Am. Compl. ¶ 104.)  There is thus a factual question as to whether Plaintiff's statements to Matsuda were made pursuant to his official duties and as to whether Chinen was aware of those statements.  This Court will not resolve these questions on a motion to dismiss.[2]

---

[2/] There also appears to be a factual question as to whether Plaintiff's statement to Matsuda was a substantial or motivating factor in the decision not to renew his employment.  The Second Amended Complaint alleges that the statement occurred during Plaintiff's union grievance period.  (2d Am. Compl. ¶ 96.)  It

Plaintiff also alleges that he "spoke out about principles of federal law that must be observed . . . to his fellow workers at the SHPD, to those he related with in the professional archeological community, and with members of the community such as indicated in [paragraph] 30." (2d Am. Compl. ¶ 89.) Paragraph 30 primarily discusses the objections that Plaintiff raised with Chinen. (2d Am. Compl. ¶ 30.) In the context of discussing his objections pertaining to the Superferry project, Plaintiff references exhibit D to the Second Amended Complaint, which includes notes from a public meeting. The notes reflect that, at the meeting, Plaintiff explained that the SHPD would be actively involved with determining preservation measures for archaeological sites in the development area such as heiaus and that the area should be resurveyed. (Id., Ex. D at 6.)

Chinen argues that Plaintiff's statements regarding "principles of federal law" were not a substantial or motivating factor in the decision not to renew his employment. (See Chinen's Mem. in Support of her Mot. to Dismiss 14.) The Second Amended Complaint alleges that Plaintiff's employment was not renewed because he voiced his opinion that numerous practices at the SHPD were unethical, culturally insensitive, or illegally

---

does not allege when that period occurred, but it would be logical for that period to have occurred after Plaintiff learned that his employment was not renewed, such that he could assert a grievance as to that decision.

violating numerous federal laws.  (2d Am. Compl. ¶¶ 2, 100.)
Nowhere does it allege that his employment was not renewed simply
because he "spoke out about principles of federal law that must
be observed." (<u>See</u> <u>id.</u> ¶ 89.)  Thus, Plaintiff has failed to
allege that his statements regarding the requirements of federal
law were substantial or motivating factors in the decision
against renewing his employment.

It is alleged that Plaintiff confided with his friend,
Dr. John Peterson, a former member of the advisory counsel on
historic preservation, to seek counsel on what to do about the
illegal activity within the SHPD. (<u>Id.</u> ¶ 98.)  He also confided
in many other friends, many with professional qualifications, for
advice on what he should do in response to the illegal activities
at the SHPD. (<u>Id.</u> ¶ 99.)  Additionally, Plaintiff alleges that
he told Chinen that he would speak out against the illegal
practices of the SHPD and that he "eventually" did so before the
state legislature. (<u>Id.</u> ¶ 90.)

Chinen argues that Plaintiff has failed to allege that
the foregoing statements were a substantial or motivating factor
in the decision not to renew his employment. (Chinen's Mem. in
Supp. of her Mot. to Dismiss 15; Chinen's Reply Mem. in Support
of her Mot. to Dismiss Pl. 4.)  With respect to Plaintiff's
statements to his friends, Chinen asserts that there is no
allegation that she knew about the statements before she decided

against renewing his employment.  (<u>See</u> Chinen's Mem. in Supp. of
her Mot. to Dismiss 16.)  And, with respect to Plaintiff's
testimony before the legislature, Chinen asserts that Plaintiff
fails to say whether the testimony took place before she decided
not to renew his contract.  (<u>Id.</u> at 15.)

Although the Second Amended Complaint does not
specifically assert that the adverse employment action was caused
by Plaintiff's statements to his friends and his testimony before
the legislature, it does broadly allege that his contract was not
renewed because he voiced his opinion that numerous practices at
the SHPD were illegally violating numerous federal laws.  (2d Am.
Compl. ¶¶ 2, 85.)  Reading paragraphs 2, 85, 90, 98, and 99
together and in the light most favorable to Plaintiff, this Court
finds a reasonable inference that the statements referenced in
paragraph 2 included Plaintiff's statements to his friends and
his testimony before the legislature.  <u>See</u> <u>Fed'n of African Am.</u>
<u>Contractors</u>, 96 F.3d at 1207.  The Second Amended Complaint thus
implicitly alleges that Plaintiff's employment was not renewed in
light of his statements to his friends in the community and his
testimony before the legislature.  (<u>See</u> 2d Am. Compl. ¶¶ 2, 85,
90, 98, 99.)  Because Plaintiff has alleged such a nexus between
the adverse employment action and his statements to his friends
and the legislature, there is a reasonable inference that Chinen
was aware of Plaintiff's statements to his friends before she

28

decided against renewing his employment and that Plaintiff's testimony to the legislature occurred prior to the decision.[3]   In light of those inferences, this Court concludes that Plaintiff has sufficiently alleged that his statements were a substantial or motivating factor in the decision not to renew his employment. See Smith v. Cen. Dauphin Sch. Dist., 419 F. Supp. 2d 639, 648 (M.D. Pa. 2005) (holding that the plaintiff, a school teacher, had adequately pled causation in her First Amendment retaliation claim, given that she had alleged that she had suffered retaliation at the defendant's hands because she had contacted state agencies and others about her belief that certain school buildings were unsafe and unhealthy).

Accordingly, this Court grants the motions to dismiss Plaintiff's First Amendment retaliation claim against the State and Chinen, in her individual capacity, to the extent that the claim is premised upon Plaintiff's statements to Chinen and his

---

[3] Plaintiff asserts that the inference that Chinen was aware of his statements to his friends is reinforced by her statements that she made to him on June 1, 2006. (Pl.'s Mem. in Opp'n to Chinen's Mot. to Dismiss 12.)   The Second Amended Complaint alleges that, on that date, Chinen informed Plaintiff that she had received complaints from the private archeology community regarding Plaintiff's changing policy single-handedly and his inconsistent application of those changes.  (2d Am. Compl. ¶ 57.)   This Court finds that it would be unreasonable to infer that Chinen was aware of Plaintiff's complaints to his friends regarding illegal practices in light of her June 1, 2006 statement, because Chinen's statement concerned not the SHPD's illegal practices, but rather Plaintiff's changing policy single-handedly.

statements regarding the requirements of federal law.  (See 2d Am. Compl. ¶¶ 30, 41, 48, 52, 79, 89.)  But, at the same time, this Court denies the motions to dismiss the claim insofar as the claim is premised upon Plaintiff's statements to Robert Matsuda, Dr. John Peterson, Plaintiff's other friends, and the legislature.  (See id. ¶¶ 90, 96, 98–99.)

### B.   Qualified Immunity

Chinen, in her individual capacity, contends that she is entitled to qualified immunity as to Plaintiff's First Amendment retaliation claim.  (Chinen's Mem. in Supp. of her Mot. to Dismiss 17.)  "Qualified immunity . . . shields § 1983 defendants 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Deveraux v. Abbey, 263 F.3d 1070, 1074 (9th Cir. 2001) (en banc) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  In deciding a claim of qualified immunity, this Court considers (1) "whether the facts that a plaintiff has alleged (see Fed. Rules Civ. Proc. 12(b)(6), (c)) or shown (see Rules 50, 56) make out a violation of a constitutional right" and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  See Pearson v. Callahan, No. 07-751, 2009 U.S. LEXIS 591, at *15–*16 (U.S. Jan. 21, 2009) (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)); id. at *8,

*22 (overruling <u>Saucier</u>'s requirement that the two prongs be decided sequentially and granting courts "discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand").  This Court has already determined that Plaintiff has sufficiently alleged that Chinen's decision not to renew Plaintiff's employment violated his First Amendment right against retaliation.  <u>See</u> <u>supra</u> section II.B.[4]  The question is therefore whether that right was clearly established when she so decided.

"A right is clearly established if its contours are 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  <u>Center for Bio-Ethical Reform, Inc. v. Los Angeles County Sheriff Dep't</u>, 533 F.3d 780, 793 (9th Cir. 2008) (quoting <u>Saucier v. Katz</u>, 533 U.S. 194, 202 (2001)).  "If the controlling law is not clearly established, an official cannot be liable, because 'a reasonable person would not be expected to know how to structure his conduct to avoid liability.'"  <u>Dela Cruz v. Kauai County</u>, 279 F.3d 1064, 1069 (9th Cir. 2002) (quoting <u>Mendoza v. Block</u>, 27 F.3d 1357, 1361 (9th Cir. 1994)).  In this case, Chinen essentially argues

---

[4] There are, however, significant questions of fact regarding whether Plaintiff's statements were a substantial or motivating factor in the decision not to renew his employment. <u>See</u> <u>supra</u> section II.B.

that the First Amendment right against retaliation was not clearly established by 2006.  (Chinen's Mem. in Supp. of her Mot. to Dismiss 19.)  Yet, in a case involving retaliatory acts that allegedly occurred in 1996 and 2000, the Ninth Circuit held that the constitutional protection of employee speech and a First Amendment cause of action for retaliation against protected speech were clearly established prior to those dates.  Coszalter, 320 F.3d at 979; see also Eng, 2009 U.S. App. LEXIS 577, at *36-*37 (holding that a public employee's First Amendment right to comment upon matters of public concern was clearly established by 2001).  This Court therefore concludes that Plaintiff's First Amendment right against retaliation was clearly established prior to the decision not to renew his employment in 2006.

Even if the right was clearly established, Chinen may nevertheless be entitled to qualified immunity if she made a reasonable mistake about the law's requirements.  See Center for Bio-Ethical Reform, 533 F.3d at 794.  She asserts that, at best, Plaintiff's speech is closely related to his job.  (Chinen's Mem. in Supp. of her Mot. to Dismiss 20.)  She further contends that she would have reasonably believed that Plaintiff was communicating regarding matters relating to his official duties and that she was not violating his constitutional rights.  (Id.; Chinen's Reply Mem. in Supp. of her Mot. to Dismiss 5.)  Chinen's

32

contention that she could have been reasonably mistaken that
Plaintiff was communicating pursuant to his official duties is
unpersuasive.  As the Ninth Circuit explained in Eng:

> Garcetti concluded only that work product
> that owes existence to [a public employee]'s
> professional responsibilities is not
> protected by the First Amendment.  Prior to
> Garcetti, the Defendants therefore may have
> been uncertain whether [an employee's report]
> itself was protected, but only insofar as
> they might reasonably have believed that it
> was protected when in fact it was not.  There
> could be no confusion, however, that when
> [the employee] commented upon matters of
> public concern as a citizen and not pursuant
> to his job responsibilities, his speech was
> protected by the First Amendment—that rule
> had long been the law of the land.

2009 U.S. App. LEXIS 577, at *36 (quotation marks and brackets
omitted).  Thus, in this case, Chinen might reasonably have
believed that Plaintiff's speech was protected when in fact it
was not.  See id.  However, such belief would not benefit
Chinen's claim of qualified immunity.  See id.

    Plaintiff avers that Chinen retaliated against him with
an improper motive to interfere with his First Amendment rights.
(2d Am. Compl. ¶ 101.)  Accordingly, there appears to be a
factual question as to whether Chinen had an improper motive to
interfere with Plaintiff's First Amendment rights.  See Center
for Bio-Ethical Reform, 533 F.3d at 794.  It would therefore be
premature to grant Chinen qualified immunity at this stage in the
proceedings, as this matter is presently before this Court on a

motion to dismiss.  Consequently, this Court denies Chinen's motion to dismiss count I of the Second Amended Complaint on the ground that she is entitled to qualified immunity.

### III. Plaintiff's NAGPRA Claim

In count II of the Second Amended Complaint, Plaintiff alleges a claim under the NAGPRA relating to the act's permitting and inventorying requirements.  Under the statute, the intentional removal from or excavation of Native American cultural items from any lands administered for the benefit of Native Hawaiians pursuant to the Hawaiian Homes Commission Act and section 4 of Public Law 86-3 for purposes of discovery, study, or removal of such items is permitted if, among other things, such items are excavated or removed in accordance with the requirements of the Archaeological Resources Protection Act of 1979 ("ARPA"), 16 U.S.C. § 470cc.  See 25 U.S.C. §§ 3001(15), 3002(c)(1); 43 C.F.R. § 10.3(b)(1).  The Department of Hawaiian Home Lands ("DHHL") is the issuing agency for permits, and the SHPD of the DLNR acts in an advisory capacity in the process.  43 C.F.R. § 10.3(b)(1).  The procedures and requirements for issuing permits must be consistent with those required by the ARPA and its implementing regulations.  Id.; see also 1 Cohen's Handbook of Federal Indian Law § 20.02[1][d][iv], at 1241-42 (2005).

The State appears to have implemented 43 C.F.R. § 10.3(b)(1)'s directives through Hawai'i Revised Statutes

("HRS") Chapter 6E, which provides that, before any agency or officer of the State or its political subdivisions commences any project that may affect historic property, aviation artifact, or a burial site, the agency or officer must advise the DLNR and allow the DLNR an opportunity for review of the effect of the proposed project on historic properties, aviation artifacts, or burial sites, consistent with HRS § 6E-43.  HRS § 6E-8(a).  The DHHL, prior to any proposed project relating to lands under its jurisdiction, must consult with the DLNR regarding the effect of the project upon historic property or a burial site.  Id. § 6E-8(b).  The proposed project may not be commenced, or, in the event that it has already begun, continued, until the DLNR has given its written concurrence.  Id. § 6E-8(a).  The DLNR is to provide its written concurrence or non-concurrence within ninety days after the filing of a request.  Id.  The agency or officer seeking to proceed with the project, or any person, may appeal the DLNR's concurrence or non-concurrence to the Hawaii Places Review Board ("HPRB").  Id.  And any agency, officer, or other person who is dissatisfied with the decision of the HPRB may apply to the governor, who may request the Hawaii Advisory Council on Historic Preservation to report or who may take action as is deemed best in overruling or sustaining the DLNR.  Id. Hawai'i Administrative Rules ("HAR") Chapter 300, entitled Rules of Practice and Procedure Relating to Burial Sites and Human

Remains, was promulgated pursuant to HRS Chapter 6E and states that, "[t]o the extent possible, [HAR Chapter 300] may coordinate with any and all appropriate federal statutes and regulations including but not limited to the applicable provisions of the Native American Graves Protection and Repatriation Act."  HAR § 13-300-3(e).

     With respect to NAGPRA's inventory requirements, the act provides that each "museum" that has possession or control over holdings or collections of Native American human remains and associated funerary objects must compile an inventory of such items and, to the extent possible based on information possessed by such museum, identify the geographical and cultural affiliation of such items.  25 U.S.C. § 3003(a).  Such inventories and identifications must be completed by no later than November 16, 1995.  Id. § 3003(b)(1)(B).  Any museum that has made a good faith effort to carry out an inventory and identification, but has been unable to complete the process, may appeal to the Secretary for an extension of time.  Id. § 3003(c).

     In the case at bar, Plaintiff alleges that the SHPD is a "museum" to the extent that it receives federal funds.  See (2d Am. Compl. ¶ 112); see also 5 U.S.C. § 3001(8) (defining "museum" as "any institution or State or local government agency (including any institution of higher learning) that receives Federal funds and has possession of, or control over, Native

36

American cultural items"). He further alleges that the State and Chinen, in her official capacity, violated numerous policies of the NAGPRA and that the violations are ongoing under Thielen and McMahon, in their official capacities. (2d Am. Compl. ¶ 110.) To illustrate, Plaintiff refers to the acts and omissions that allegedly occurred in connection with the "General Growth," "Hokulia," "Turtle Bay," and "Kaloko Heights" projects. (Id. ¶ 117 (citing id. ¶ 30).) Plaintiff additionally alleges that, because of the insufficient library at the SHPD, Native Hawaiian organizations cannot obtain adequate information as required by NAGPRA. (Id. ¶ 118.) In his prayer for relief, Plaintiff seeks state-wide injunctive relief enjoining all relevant parts of the State, Thielen, and McMahon from continuing the policies that he objects to in the Second Amended Complaint, including the policies concerning the handling of human remains and the violation of archeological treasures by fast-tracking development projects, which is presently happening at Turtle Bay and numerous other parts of the State. (Id. at 28.) Plaintiff alleges that the State presently plans to purchase the land at Turtle Bay for $400 million to protect and preserve it in perpetuity, but that it also plans to build at least one more resort. (Id. ¶ 30.e.) According to Plaintiff, the construction of one more resort at Turtle Bay could potentially harm or displace hundreds of Hawaiian burials. (Id.)

This Court previously dismissed the NAGPRA claim that Plaintiff had asserted in his original complaint, because he did not assert an ongoing violation of the act and his claim was thus barred by the Eleventh Amendment.  (Order Granting Defs.' Mots. to Dismiss 33.)  The alleged NAGPRA violations that occurred in connection with the "General Growth," "Hokulia," and "Kaloko Heights" projects appear to have occurred in 2005 and 2006 when Plaintiff was employed at the SHPD.  (2d Am. Compl. ¶ 117 (citing id. ¶ 30).)  His NAGPRA claim is thus subject to dismissal to the extent that it is premised upon those past violations.  The only aspect of his NAGPRA claim that appears to assert an ongoing violation of the NAGPRA is the allegation that Defendants are violating the NAGPRA by fast-tracking development projects at Turtle Bay and numerous other parts of the State. (Id. at 28.)  Plaintiff's assertion that NAGPRA permitting procedures are currently being violated at Turtle Bay appears to be premature.  Plaintiff alleges that the State presently plans to purchase the land for $400 million and to build at least one more resort.  (Id. ¶ 30.e.)  Thus, the alleged violations of any applicable permitting requirements under the NAGPRA in connection with the construction of the new resort are, at this point, hypothetical at best.  Consequently, Plaintiff does not allege any ongoing violations of the NAGPRA in connection with the Turtle Bay project, and his vague reference to ongoing violations

38

at "numerous other parts of the State" is insufficient to sustain the permitting component of his NAGPRA claim.  See N. Star Int'l v. Arizona Corp. Comm'n, 720 F.2d 578, 583 (9th Cir. 1983) (dismissing a claim that securities laws were unconstitutionally vague and arbitrarily applied, because the claim was vague, conclusory, and general and because it failed to set forth any supporting factual allegations).[5]  Therefore, what appears to remain of Plaintiff's NAGPRA claim is the allegation that the act is currently being violated in light of the act's inventory requirements.

Chinen, in her official capacity, and the State argue that this Court should dismiss the NAGPRA claim because Plaintiff has failed to allege that he has exhausted his administrative remedies.  (Defs.' Mem. in Supp. of their Mot. to Dismiss 6.) "Where relief is available from an administrative agency, the plaintiff is ordinarily required to pursue that avenue of redress before proceeding to the courts; and until that recourse is

_____

[5] This Court assumes that the State will comply with any applicable provisions of the NAGPRA if it goes forward in the Turtle Bay project.  "'Article III standing requires an injury that is actual or imminent, not conjectural or hypothetical.  In the context of injunctive relief, the plaintiff must demonstrate a real or immediate threat of an irreparable injury.'"  Clark v. City of Lakewood, 259 F.3d 996, 1107 (9th Cir. 2001) (quoting Cole v. Oroville Union High Sch., 228 F.3d 1092, 1100 (9th Cir. 2000)).  Because the State does not yet appear to hold an ownership interest in the Turtle Bay project (see 2d Am. Compl. ¶ 30.3), this Court concludes that Plaintiff has not sufficiently alleged an actual or imminent threat of irreparable injury.

exhausted, suit is premature and must be dismissed." <u>Reiter v. Cooper</u>, 507 U.S. 258, 269 (1993).  Defendants observe that the Secretary of the Interior may impose monetary penalties upon museums for their violations of the NAGPRA.  (<u>Id.</u> at 5 (citing 25 U.S.C. § 3007).)  Any person may indeed inform the secretary of such violations.  43 C.F.R. § 10.12(c).  In addition, Defendants point out that

> [a]ny person who wishes to contest actions
> taken by museums, Federal agencies, Indian
> tribes, or Native Hawaiian organizations with
> respect to the repatriation and disposition
> of human remains, funerary objects, sacred
> objects, or objects of cultural patrimony is
> encouraged to do so through informal
> negotiations to achieve a fair resolution of
> the matter.

43 C.F.R. § 10.17(a); <u>see also</u> <u>id.</u> § 10.15(c) (requiring exhaustion of administrative remedies with respect to matters of repatriation and disposition); <u>Monet v. Hawaii</u>, No. 96-16417, 1997 U.S. App. LEXIS 11297, at *4 (9th Cir. May 12, 1997) (explaining that the regulations implementing the NAGPRA required the plaintiff to exhaust his administrative remedies before asserting his repatriation claim); <u>Na Iwi O Na Kupuna O Mokapu</u>, 894 F. Supp. 1397, 1405-06 (D. Haw. 1995) (concluding that exhaustion of administrative remedies was required under the NAGPRA in order to assert a repatriation claim).  But Plaintiff is not seeking monetary penalties against the State.  (<u>See</u> 2d Am. Compl. at 27-29.)  Nor does he appear to be seeking to contest

40

the repatriation of human remains, funerary objects, sacred objects, or objects of cultural patrimony. (See id.)  Instead, Plaintiff requests only prospective injunctive relief relating to the SHPD's inventory procedures. (Id. at 28.)  The State and Chinen, in her official capacity, have not identified, and this Court has not found, any provision in the NAGPRA or in the regulations promulgated thereunder that empowers the Secretary of the Interior to afford such relief.  "[A] litigant need not apply to an agency that has 'no power to decree relief.'"  Booth v. Churner, 532 U.S. 731, 741 n.6 (2001) (quoting Reiter, 507 U.S. at 269) (ellipsis omitted).

Defendants cite Bonnichsen v. United States, Department of the Army, 969 F. Supp. 614 (D. Or. 1997), aff'd, 357 F.3d 962 (9th Cir. 2004), in support of their argument that Plaintiff must exhaust his administrative remedies in order to pursue his claim under the NAGPRA. (Defs.' Mem. in Supp. of their Mot. to Dismiss 6.)  In that case, the Army Corps of Engineers ("Corps") took custody of a nine-thousand-year-old skeleton of a man and published a notice of intent to repatriate the remains pursuant to the NAGPRA. Bonnichsen, 969 F. Supp. at 617–18.  A lawsuit was filed by several scientists who sought to enjoin the repatriation in order to conduct a study determining the origins of the man. Id. at 618.  A second suit was filed by members of a church that sought to halt the repatriation because they believed

41

that the man was one of their ancestors and was not related to present-day Native Americans.  Id.  The Corps moved to dismiss these actions on the ground that the scientists and the church members had failed to exhaust their administrative remedies.  Id. at 619.  The court held that the actions were not barred for failure to exhaust administrative remedies, because the Corps had not called the court's attention to any administrative procedure by which the plaintiffs could have formally contested the determination that the remains were those of a Native American or subject to the NAGPRA.  Id. at 623-24.  The court explained that the regulations permitted an Indian tribe or a Native American who can prove that he is a direct lineal descendant and who claims ownership of remains can file a claim in order to seek repatriation or disposition of human remains.  Id. at 624-25.  It further reasoned that the plaintiffs were neither Indian tribes nor Native Americans and that they were not seeking, but opposing, repatriation.  Id. at 624.  There were simply no administrative remedies for the plaintiffs to exhaust.  See id. Similarly, in the present matter, Defendants have not identified any NAGPRA regulations through which Plaintiff could obtain the relief that he seeks in his Second Amended Complaint.  (See 2d Am. Compl. at 28.)  Their citation to Bonnichsen is unavailing.

Defendants also argue that this Court should dismiss count II because Plaintiff has failed to allege that the State

has violated the "regulations" promulgated by the Secretary of the Interior under the NAGPRA. (Defs.' Mem. in Supp. of their Mot. to Dismiss 6.) They further contend that the count should be dismissed because Plaintiff has also failed to allege that the secretary has not granted the State waivers or extensions regarding its compliance with the NAGPRA. (_Id._) They do not, however, identify where the act calls for such allegations. (_See id._) Instead, it states that "[t]he United States district courts shall have jurisdiction over any action brought by any person alleging a violation of this Act and shall have the authority to issue such orders as may be necessary to enforce the provisions of this Act." 25 U.S.C. § 3013. Thus, it is enough that Plaintiff has alleged violations of the NAGPRA. (_See_ 2d Am. Compl. ¶ 110.) In summary, Chinen, in her official capacity, and the State's motion to dismiss is denied insofar as it requests dismissal of the inventory component of Plaintiff's NAGPRA claim, but granted to the extent that it seeks dismissal of the permitting component.

In her individual capacity, Chinen also moves to dismiss count II. (Chinen's Mem. in Supp. of her Mot. to Dismiss 20–22.) Yet that count does not assert a claim against her in her individual capacity. (_See_ 2d Am. Compl. at 25.) Her motion is denied accordingly.

**CONCLUSION**

For the foregoing reasons, this Court:  (1) DENIES the motion filed by the State and Chinen, in her official capacity, to dismiss Plaintiffs' First Amendment retaliation claim against Chinen in her official capacity, because that claim is not asserted against her in her official capacity; (2) GRANTS the motions filed by the State and Chinen, in both her official and individual capacities, to dismiss Plaintiff's First Amendment retaliation claim against the State and Chinen, in her individual capacity, to the extent that the claim is premised upon Plaintiff's statements to Chinen and his statements regarding the requirements of federal law; (3) DENIES the motions filed by the State and Chinen, in both her official and individual capacities, to dismiss Plaintiff's First Amendment retaliation claim against the State and Chinen, in her individual capacity, insofar as the claim is premised upon Plaintiff's alleged statements to Robert Matsuda, Dr. John Peterson, Plaintiff's other friends, and the legislature; (4) GRANTS the motion filed by the State and Chinen, in her official capacity, to dismiss Plaintiff's NAGPRA claim against Chinen, Thielen, and McMahon, in their official capacities, and the State, to the extent that the claim is premised upon NAGPRA's permitting requirements; (5) DENIES the motion filed by the State and Chinen, in her official capacity, to dismiss Plaintiff's NAGPRA claim against Chinen, Thielen, and

44

McMahon, in their official capacities, and the State, to the extent that the claim is premised upon NAGPRA's inventory requirements; and (6) DENIES the motion filed by Chinen, in her individual capacity, to dismiss Plaintiff's NAGPRA claim, because that claim is not asserted against her in her individual capacity.

In dismissing a complaint for failure to state a claim, "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegations of other facts." Cook, Perkiss & Liehe, Inc. v. N. California Collection Serv., Inc., 911 F.2d 242, 247 (9th Cir. 1990) (per curiam); see also Bly-Magee v. California, 236 F.3d 1014, 1017, 1019 (9th Cir. 2001) (holding that the plaintiff should have been given leave to amend her first amended complaint, where she had previously been granted leave to amend her original complaint, because the pleading could possibly be cured by the allegation of other facts). Plaintiff is therefore given thirty days leave to amend the Second Amended Complaint in accordance with this order. This Court assumes that, if Plaintiff agrees that his statements to Matsuda and the legislature were made after the decision not to renew his employment, he will not premise his First Amendment retaliation claim upon those statements.

45

IT IS SO ORDERED

Dated:  Honolulu, Hawai'i, February 10, 2009



_____
Alan C. Kay
Sr. United States District Judge

Brown v. Hawai'i, Civ. No. 07-00556 ACK-LEK:  Order:  (1) Granting in Part and Denying in Part Defendants' Motions to Dismiss the Second Amended Complaint; and (2) Granting Plaintiff Thirty Days Leave to Amend the Complaint