IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| DAVID BROWN, | ) | Civ. No. 07-00556 ACK-LEK |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| STATE OF HAWAII, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**ORDER GRANTING CHINEN'S MOTION FOR SUMMARY JUDGMENT AND THE STATE DEFENDANTS' JOINDERS THEREIN AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**PROCEDURAL HISTORY**

On November 7, 2007, Plaintiff David Brown filed a complaint against, <u>inter alios</u>, Defendants Melanie Chinen, in her individual capacity and in her official capacity as the Administrator of the State Historic Preservation Division ("SHPD") of the Department of Land and Natural Resources ("DLNR"), and the State of Hawaii ("State"). The complaint asserted a number of claims, including a 42 U.S.C. § 1983 First Amendment retaliation claim and a claim under the Native American Graves and Repatriation Act ("NAGPRA"), 25 U.S.C. § 3001 <u>et seq.</u> On May 14, 2008, the Court granted motions to dismiss filed by Chinen and the State. <u>Brown v. Chinen ("Brown I")</u>, Civ. No. 07-00556 ACK-LEK, 2008 U.S. Dist. LEXIS 39659 (D. Haw. May 14, 2009). The Court dismissed Plaintiff's First Amendment

retaliation claim and his NAGPRA claim, but granted him leave to amend.

On June 13, 2008, Plaintiff filed a first amended complaint, which realleged his First Amendment and NAGPRA claims. On October 10, 2008, Plaintiff filed a motion to amend the first amended complaint, which included a copy of a second amended complaint.  The second amended complaint added as Defendants Nancy McMahon and Laura Thielen in their respective official capacities as the current Administrator of the SHPD and Director of the DLNR.  On October 24, 2008, the parties filed a stipulation to amend the first amended complaint.  On February 10, 2009, the Court granted in part and denied in part motions to dismiss the second amended complaint filed by Chinen and the State regarding the First Amendment and NAGPRA claims.  Brown v. Hawai'i ("Brown II"), Civ. No. 07-00556 ACK-LEK, 2009 U.S. Dist. LEXIS 10546 (D. Haw. Feb. 10, 2009).  The Court again granted Plaintiff leave to amend.

On March 12, 2009, Plaintiff filed a third amended complaint ("Third Amended Complaint" or "3d Am. Compl."), which reasserts the First Amendment retaliation claim in Count I and the NAGPRA claim in Count II.  Two motions for summary judgment have been filed with respect to the Third Amended Complaint.

On June 15, 2009, Chinen, in her individual capacity, filed a motion for summary judgment as to Plaintiff's First

2

Amendment retaliation claim in Count I ("Chinen's Mot."), accompanied by a memorandum in support ("Chinen's Mem.") and a concise statement of facts ("Chinen's Mot. CSF").  The State and Chinen, Thielen, and McMahon, in their official capacities (collectively, "State Defendants"), thereafter filed joinders in the motion.  Chinen, in her individual capacity, filed an amended concise statement of facts ("Chinen's Mot. Am. CSF").  Plaintiff filed an opposition to the motion ("Pl.'s Opp'n") and a concise statement of facts ("Pl.'s Opp'n CSF").  He then filed additional declarations and an exhibit.  Chinen filed a reply in support of her motion.

On June 19, 2009, Plaintiff filed a motion for summary judgment as to his NAGPRA claim in Count II ("Pl.'s Mot."), accompanied by a memorandum in support ("Pl.'s Mem.") and a concise statement of facts ("Pl.'s Mot. CSF").  The State and Chinen, in her official capacity, filed an opposition ("St. Defs.' Opp'n") and a concise statement of facts ("St. Defs.'

CSF").[1/]   Thielen and McMahon filed a joinder in the opposition.

Plaintiff filed a reply in support of his motion.[2/]

On September 21, 2009, the Court held a hearing on the

motions for summary judgment.

## FACTUAL BACKGROUND[3/]

On September 16, 2005, the State hired Plaintiff as the

Branch Chief Archeologist for the SHPD.  Chinen's Mot. Am. CSF

¶ 1.  Chinen was the Administrator of the SHPD and Plaintiff's

direct supervisor.  Id. ¶ 2.  During his employment, Plaintiff

---

[1/] Plaintiff points out that the State and Chinen's concise statement of facts does not controvert the factual assertions set forth in his concise statement of facts.  He therefore contends that those assertions should be deemed admitted pursuant to Rule 56.1(g) of this Court's Local Rules of Practice and Procedure.  While the State and Chinen's concise statement of facts does not specifically address each of the five paragraphs in Plaintiff's concise statement by number, it does set forth points that are plainly responsive to those paragraphs.  As such, Plaintiff's factual assertions shall not be deemed admitted for the reason that Chinen and the State failed to specifically respond to his concise statement of facts by paragraph.  Of course, it is the better practice for a party to respond to a concise statement of facts by paragraph.

[2/] In his opposition to Chinen's motion and his reply in support of his motion as to his NAGPRA claim, Plaintiff contends that Chinen, in her individual capacity, and the State Defendants have engaged in discovery abuse.  He previously filed a motion for discovery abuse sanctions, which Magistrate Judge Leslie E. Kobayashi denied on the basis that the motion was untimely in light of her amended scheduling order.  Plaintiff has not appealed that ruling.  Accordingly, the Court declines to consider his discovery abuse arguments at this time.

[3/] The facts in this order are recited for the limited purpose of deciding the motions for summary judgment and shall not be construed as findings of fact upon which the parties may rely in future proceedings in this case.

became increasingly concerned that Chinen and the SHPD were acting illegally, unethically, and unprofessionally.  E.g., 3d Am. Compl. ¶ 2.  He expressed his concerns directly to Chinen, as well as numerous other individuals.  E.g., id. ¶¶ 30, 152.

On June 1, 2006, Chinen met with Plaintiff and indicated that she was dissatisfied with, and had received complaints stemming from, his work at the SHPD.  Chinen's Mot. Am. CSF ¶ 3.  On June 13, 2006, Chinen formally notified Plaintiff that his appointment would not be renewed.  Id. ¶ 4. His last day as a state employee was June 30, 2006.  Id. ¶ 6.

## LEGAL STANDARDS

The purpose of summary judgment is to identify and dispose of factually unsupported claims and defenses.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Summary judgment is therefore appropriate if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  "A fact is 'material' when, under the governing substantive law, it could affect the outcome of the case.  A 'genuine issue' of material fact arises if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n, 322 F.3d 1039, 1046 (9th Cir. 2003) (quoting Anderson

5

v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)) (citation omitted).[4/]  Conversely, where the evidence could not lead a rational trier of fact to find for the nonmoving party, no genuine issue exists for trial.  See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The moving party has the burden of persuading the court as to the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323; Miller, 454 F.3d at 987.  The moving party may do so with affirmative evidence or by "'showing'—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  Celotex, 477 U.S. at 325.[5/] Once the moving party satisfies its burden, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment.  See id. at 323; Matsushita Elec., 475 U.S. at 586; Cal. Arch. Bldg. Prods., Inc. v.

---

[4/] Disputes as to immaterial issues of fact do "not preclude summary judgment."  Lynn v. Sheet Metal Workers' Int'l Ass'n, 804 F.2d 1472, 1483 (9th Cir. 1986).

[5/] When the moving party bears the burden of proof at trial, that party must satisfy its burden with respect to the motion for summary judgment by coming forward with affirmative evidence that would entitle it to a directed verdict if the evidence were to go uncontroverted at trial.  Miller, 454 F.3d at 987.  When the nonmoving party bears the burden of proof at trial, the party moving for summary judgment may satisfy its burden with respect to the motion for summary judgment by pointing out to the court an absence of evidence from the nonmoving party.  Id.

Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987).[6]
The nonmoving party must instead set forth "significant probative
evidence" in support of its position.   T.W. Elec. Serv. v. Pac.
Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).
Summary judgment will thus be granted against a party who fails
to demonstrate facts sufficient to establish an element essential
to his case when that party will ultimately bear the burden of
proof at trial.   See Celotex, 477 U.S. at 322.

When evaluating a motion for summary judgment, the
court must construe all evidence and reasonable inferences drawn
therefrom in the light most favorable to the nonmoving party.
See T.W. Elec. Serv., 809 F.2d at 630-31.[7]   Accordingly, if
"reasonable minds could differ as to the import of the evidence,"
summary judgment will be denied.   Anderson, 477 U.S. at 250-51.

_____

[6] Nor will uncorroborated allegations and "self-serving
testimony" create a genuine issue of material fact.   Villiarimo
v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002);
see also T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n, 809
F.2d 626, 630 (9th Cir. 1987).

[7] At the summary judgment stage, the court may not make
credibility assessments or weigh conflicting evidence.   Anderson,
477 U.S. at 249; Bator v. Hawaii, 39 F.3d 1021, 1026 (9th Cir.
1994).

## DISCUSSION

The Court will first take up Chinen's motion for summary judgment, and the State Defendants' joinders therein, as to the First Amendment retaliation claim set forth in Count I of the Third Amended Complaint.  The Court will then consider Plaintiff's motion for summary judgment as to his NAGPRA claim in Count II.

I.   **Count I of the Third Amended Complaint:  First Amendment Retaliation**

In Count I of the Third Amended Complaint, Plaintiff alleges, under 42 U.S.C. § 1983, that Chinen decided not to rehire him as punishment for making statements to her and others regarding illegal, unethical, and culturally-insensitive practices by her and the SHPD, in contravention of the First Amendment.  3d Am. Compl. ¶¶ 140-41.  Chinen, in her individual capacity, contends that Plaintiff has failed to establish a First Amendment retaliation claim.

"Public employees suffer a constitutional violation when they are wrongfully terminated or disciplined for making protected speech."  Marable v. Nitchman, 511 F.3d 924, 929 (9th Cir. 2007).  A First Amendment retaliation claim involves "'a sequential five-step series of questions'":

> First, the plaintiff bears the burden of showing:  "(1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; and (3) whether the

8

> plaintiff's protected speech was a
> substantial or motivating factor in the
> adverse employment action."  Next, if the
> plaintiff has satisfied the first three
> steps, the burden shifts to the government to
> show:  "(4) whether the state had an adequate
> justification for treating the employee
> differently from other members of the general
> public; and (5) whether the state would have
> taken the adverse employment action even
> absent the protected speech."

Robinson v. York, 566 F.3d 817, 822 (9th Cir. 2009) (quoting Eng

v. Cooley, 552 F.3d 1062, 1070-73 (9th Cir. 2009)) (brackets

omitted), writ of certiorari filed on May 26, 2009.  Chinen seeks

summary judgment as to Plaintiff's First Amendment retaliation

claim based on the second and third considerations.  Chinen's

Mem. 7.[8]

### A.   Whether Plaintiff Spoke as a Private Citizen or Public Employee When He Made Statements to Chinen and at Two Meetings

"[W]hen public employees make statements pursuant to

their official duties, the employees are not speaking as citizens

for First Amendment purposes, and the Constitution does not

insulate their communications from employer discipline."

Garcetti v. Ceballos, 547 U.S. 410, 421 (2006).  In other words,

"speech which 'owes its existence to an employee's professional

---

[8] Plaintiff seems to assert that Chinen is not entitled to summary judgment in light of the first and fourth Robinson considerations.  See Pl.'s Opp'n 10-12, 18-19.  However, Chinen has not moved for summary judgment based on those considerations. Therefore, the Court does not address the first and fourth Robinson considerations at this time.

responsibilities' is not protected by the First Amendment."
Huppert v. City of Pittsburg, 574 F.3d 696, 704 (9th Cir. 2009)
(quoting Garcetti, 547 U.S. at 421).

        "[T]he inquiry into whether employee speech is pursuant
to employment duties is a practical one."  Marable, 511 F.3d
at 932.  While a formal job description is by no means
"dispositive" in determining whether a given task is within the
scope of an employee's professional duties, it is nevertheless
"instructive."  Id. at 933; see also Garcetti, 547 U.S. at 424-25
(2006) ("We reject . . . the suggestion that employers can
restrict employees' rights by creating excessively broad job
descriptions. . . . Formal job descriptions often bear little
resemblance to the duties an employee actually is expected to
perform, and the listing of a given task in an employee's written
job description is neither necessary nor sufficient to
demonstrate that conducting the task is within the scope of the
employee's professional duties for First Amendment purposes.").
A court should also "look beyond the job description to the
duties the employee actually performs."  Huppert, 574 F.3d
at 704.

        "'Statements are made in the speaker's capacity as
citizen if the speaker had no official duty to make the
questioned statements, or if the speech was not the product of
performing the tasks the employee was paid to perform.'"  Eng,

552 F.3d at 1071 (quoting <u>Posey v. Lake Pend Oreille Sch. Dist.</u>
<u>No. 84</u>, 546 F.3d 1121, 1127 n.2 (9th Cir. 2008)) (internal
quotation marks omitted).  On the other hand, "if the public
employee was paid for the speech—e.g., drafting a memorandum,
creating a report, advising a supervisor—then that compensation
might be indicative of the nature of the speech." <u>Huppert</u>, 574
F.3d at 704.  Another indicator on the issue of whether an
employee spoke pursuant to his official duties is "whether an
individual complains 'up the chain of command' or instead relays
'his concerns to persons outside the work place.'" <u>Id.</u> at 705
(quoting <u>Davis v. McKinney</u>, 518 F.3d 304, 313 (5th Cir. 2008)).

  For example, in <u>Garcetti</u>, the Supreme Court held that a
prosecutor spoke pursuant to his official duties when he wrote a
disposition memorandum to his superiors recommending that a case
be dismissed because the case was premised on a search warrant
that was obtained pursuant to an affidavit that contained
misrepresentations.  547 U.S. at 421.  In <u>Huppert</u>, the Ninth
Circuit held that two police officers spoke pursuant to their
official duties when they submitted a memorandum, at the
direction of their supervisor, to the chief of police and the
city manager regarding their investigation of improper conduct by
police employees at a golf course.  574 F.3d at 706.  In <u>Freitag</u>
<u>v. Ayers</u>, 468 F.3d 528 (9th Cir. 2006), the Ninth Circuit held
that a correctional officer spoke pursuant to her official duties

11

when she filed internal reports to her superiors of inmate sexual misconduct and sent letters and a memorandum to the warden, associate warden, and director of the department of corrections and rehabilitation documenting her supervisors' failure to respond to her reports.  Id. at 546.  In the letter, she noted that "her reports of inmate misbehavior were being 'denied or thrown away,' thus causing her 'authority and discretion [to be] undermined.'"  Id. at 534.  This communication was made pursuant to her official duties because "her supervisors' actions were preventing her from effectively doing her job, and her complaints about being ignored by them were directly related to her job duties."  Marable, 511 F.3d at 932 (discussing Freitag).

On the other hand, the Freitag court concluded that the correctional officer spoke as a citizen when she made complaints to a state senator and the state office of the inspector general. 468 F.3d at 545.  In Marable, the Ninth Circuit held that a ferry engineer spoke as a citizen when he reported corrupt practices of the state ferry system managers, who participated in overtime and "special projects" schemes, to an outside auditor and the state ethics board.  511 F.3d at 927.  In Alaska v. EEOC, 564 F.3d 1062 (9th Cir. 2009) (en banc), the Ninth Circuit held that an employee in the governor's office spoke as a citizen when she held a press conference and publicly supported a co-worker's allegations of sexual harassment in the office.  Id. at 1069–70.

12

The court reasoned that the employee's official duties did not require her to complain about the conditions of her co-worker's employment or to bring the alleged sexual harassment to the public's attention.  Id. at 1070.

"'[T]he question of the scope and content of a plaintiff's job responsibilities is a question of fact.'"  Eng, 552 F.3d at 1071 (quoting Posey, 546 F.3d at 1129-30).  In Posey, the plaintiff was employed as a security specialist at a high school.  546 F.3d at 1123-24.  Before 2002, he was responsible for twenty enumerated tasks relating to preventing and responding to student misconduct.  Id. at 1124.  However, in 2002, his job responsibilities were reduced to assisting with security and crime prevention and supervising the school parking lot, grounds, and hallways.  Id. at 1125.  He was no longer responsible for liaising with police, enforcing truancy policies, searching students, or investigating student misconduct.  Id.  In 2003, the plaintiff wrote a lengthy letter to the school district chief administrative officer, Steve Battenschlag, complaining about what he perceived to be inadequate safety and security policies at the high school.  Id. at 1124.  He wrote the letter at home, with his own resources, on his own time, and of his own initiative.  Id.  The letter was written on plain paper and casually addressed to "Steve."  Id.  In addition, the plaintiff's workplace resources were inconsistent with his having written the

13

letter with school resources.  Id.  His job was subsequently eliminated, which prompted him to file a First Amendment retaliation claim against the school district.  Id. at 1123.  The district court granted summary judgment in favor of the school district, concluding as a matter of law that the letter in question had been written pursuant to the plaintiff's job responsibilities and thus in his capacity as a public employee. Id.  The Ninth Circuit reversed and remanded, concluding that the pleadings and evidence in the case presented genuine issues of material fact regarding the scope and content of the plaintiff's job responsibilities.  Id. at 1129.

In the case at hand, Plaintiff worked as the Branch Chief Archeologist of the SHPD from September 15, 2005 through June 30, 2006.  Chinen's Mot. Am. CSF ¶¶ 1, 6.  He received a copy of his formal job description in March of 2006.  Pl.'s Opp'n CSF, Pl.'s Decl. ¶ 33.  While the description is not determinative of his official duties, it is certainly instructive.  See Marable, 511 F.3d at 933.  According to Plaintiff's formal job description, the Branch Chief Archeologist is "responsible for administering and directing the Archeological Branch of the [SHPD]."  Pl.'s Opp'n CSF, Ex. 99 at 1.  Among the qualifications for the position is knowledge of state and federal legislation, rules and regulations governing the historic

preservation program, and principles and practices of historic preservation management.  Id. at 5.

The position includes administrative duties, review work, and public-relations responsibilities.  Id. at 2-4.  First, the administrative duties require initiating, formulating, and recommending policies which affect the immediate activities of the Archeological Branch of the SHPD.  Id. at 2.  They also call for directing investigations and reviews, evaluating and making recommendations for areas of archeological importance, and recommending standards and priorities for historic preservation projects.  Id.  Second, the review work encompasses reviewing and overseeing the archeological review of conservation district use applications, environmental impact statements, state clearing house reviews, and other requests to construct, alter, or improve any historic sites as required by state law.  Id.  Third, the public-relations duties call for establishing and maintaining cooperative relationships with federal, county, state, and community organizations, and representing the SHPD in meetings with civic organizations, government agencies, and the general public in matters involving the historic preservation program. Id. at 4.

Like the job description, statements that Plaintiff made at two public meetings are informative in defining the contours of his official duties because he has acknowledged that

15

he made the statements pursuant to his official responsibilities.

See Huppert, 574 F.3d at 704; Chinen's Mot. Am. CSF ¶¶ 10, 14;

Pl.'s Opp'n CSF ¶¶ 10, 14.  The first meeting occurred on

September 28, 2005 and concerned improvements at Kawaihae Harbor

for the "Superferry."  3d Am. Compl. ¶¶ 31-37.  Plaintiff was

invited to and spoke at the meeting as a representative of the

SHPD.  Chinen's Mot. Am. CSF ¶ 10; Pl.'s Opp'n CSF ¶ 10.

According to notes that were taken at the meeting, Plaintiff

stated that:

> While no harbor plans, road plans, signage,
> []or parking plans for the Superferry have
> been reviewed by the Branch so far, the State
> Historic Preservation Division will be
> actively involved with determining
> preservation measures for archeological sites
> in the development area such as heiaus.  The
> area should be resurveyed because the current
> report is over ten years old, and many
> archeological discoveries have been made in
> the past ten years.

Chinen's Mot. CSF, Ex. 7 at 4.  In addition, Plaintiff expressed

his desire for the involvement of the Department of Hawaiian Home

Lands and various Hawaiian associations in the area.  Id.  The

second meeting took place on October 5, 2005.  Plaintiff gave a

speech to the Society for Hawaiian Archeology in his capacity as

the Branch Chief Archeologist.  3d Am. Compl. ¶¶ 38-41; Chinen's

Mot. Am. CSF ¶ 14; Pl.'s Opp'n CSF ¶ 14.  In the speech,

Plaintiff discussed his plans to streamline the SHPD's review

process so that it would run more efficiently.  Chinen's Mot.
CSF, Ex. 9 at 1-2.

     With an eye toward Plaintiff's job description and his
statements at the two meetings, the Court will now evaluate
certain statements he made to Chinen.  This is not the first
instance in which it has considered those statements.  It has
twice determined, in dismissing Plaintiff's prior complaints,
that the statements were made pursuant to his official duties.
Brown I, 2008 U.S. Dist. LEXIS 39659, at *24-*26; Brown II, 2009
U.S. Dist. LEXIS 10546, at *27-*29.

     He fares no better this time around.  Plaintiff's
complaints, which generally involved objections to Chinen's
decisions on development projects, are most similar to the
reports and complaints in Freitag, the disposition memorandum in
Garcetti, and the investigative memorandum in Huppert, all of
which were sent up the chain of command.  See Brown II, 2009 U.S.
Dist. LEXIS 10546, at *27-*28; see also 3d Am. Compl. ¶¶ 30.a-g.
For instance, with respect to a project involving "General Growth
Properties," Chinen allegedly approved an archeological survey
over Plaintiff's objection.  3d Am. Compl. ¶ 30.c.  Regarding a
"Superferry" project, Plaintiff voiced his concern to Chinen that
the Superferry should follow procedure in obtaining approvals and
permits.  Id. ¶ 30.a.  With respect to a "Hokulia" project,
Plaintiff advised Chinen not to approve a permit because of very

17

high density and frequency of archeological resources and human remains.  Id. ¶ 30.d.  These statements were plainly made in the course of the permit review process, which Plaintiff discussed at the October 5, 2005 meeting, and concerned the evaluation of preservation measures, which he addressed at the September 28, 2005 meeting.

Plaintiff attempts to cast doubt on the scope of his official duties.  He asserts that, on his first day of work at the SHPD on September 16, 2005, he was not provided with an orientation, a handbook, or a list of duties and responsibilities.  Pl.'s 09/05/2009 Mot. for Recons., Pl.'s Decl. ¶ 6.  He obtained a copy of his job description from Chinen's secretary in March of 2006.  Id. ¶ 14.  Plaintiff contends that he was never given the authority to carry out the responsibilities described in his job description.  Id. ¶ 19. For example, he asserts that he was not allowed to visit and inspect his staff on neighbor islands or to attend meetings of various Island Burial Councils.  Id. ¶ 20.  However, Plaintiff does not dispute that, as part of his administrative duties, he was responsible for directing investigations and reviews, evaluating and making recommendations for areas of archeological importance, and recommending standards and priorities for historic preservation projects.  Id. ¶ 25.  In fact, he concedes that Chinen often disregarded his recommendations for areas of

archeological importance, which suggests that he made those recommendations pursuant to his official duties.  Id. ¶ 26. Furthermore, while Plaintiff makes much of the fact that he was not allowed to consult directly with the State Deputy Attorney General assigned to the SHPD, he acknowledges that he was specifically instructed by Chinen to raise any questions or concerns of a legal nature with her.  Id. ¶ 8.  Thus, to the extent that Plaintiff objected to Chinen's permitting decisions based on his legal concerns, he was plainly acting pursuant to his official responsibilities.

Based on Plaintiff's concessions, along with his job description and his statements at the two meetings, it would appear that his various recommendations to Chinen regarding certain development projects were made pursuant to his official duties.  There is no evidence that these particular statements were made during off hours.  See Posey, 546 F.3d at 1124-25.  Nor were they made to the public, an ethics commission, or a legislator.  See Alaska, 564 F.3d at 1069-70; Marable, 511 F.3d at 927; Freitag, 468 F.3d at 545.  They were made directly to Chinen, up the chain of command, and in light of Plaintiff's official functions of advising his supervisor and reviewing permits.  See Huppert, 574 F.3d at 705.  The only statements that he made to Chinen that do not appear to concern his permit review duties involved a "Walmart" project.  3d Am. Compl. ¶ 30.b.

19

Plaintiff claims that he objected when Chinen "coerced" him to represent her, the SHPD, and the State in matters pertaining to the project. Id. There can be no doubt that Plaintiff's objection was made pursuant to his public-relations duties and in the course of advising his supervisor.

Taking the facts in the light most favorable to Plaintiff, the Court nevertheless finds as a matter of law that he was speaking not as a citizen, but as the Branch Chief Archeologist of the SHPD and pursuant to his official duties, when he voiced his concerns to Chinen. The Court will therefore grant Chinen's motion for summary judgment, and the State Defendants' joinders therein, as to Plaintiff's First Amendment retaliation claim set forth in Count I of the Third Amended Complaint insofar as the claim is premised on the statements that he made to Chinen and at the September 28, 2005 and October 5, 2005 meetings. The Court will now turn its attention to the issue of causation.

**B. Whether Plaintiff's Statements to Various Individuals Were Substantial or Motivating Factors in the Adverse Employment Action**

Under the third Robinson consideration, which asks "'whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action,'" Robinson, 566 F.3d at 822 (quoting Eng, 552 F.3d at 1070),

> a plaintiff creates a genuine issue of
> material fact on the question of retaliatory

20

> motive when he or she produces, in addition
> to evidence that the defendant knew of the
> protected speech, at least (1) evidence of
> proximity in time between the protected
> speech and the allegedly retaliatory
> decision, (2) evidence that the defendant
> expressed opposition to the speech or (3)
> evidence that the defendant's proffered
> reason for the adverse action was false or
> pretextual.

Pinard v. Clatskanie Sch. Dist. 6J, 467 F.3d 755, 771 n.21 (9th

Cir. 2006); see also Allen v. Iranon, 283 F.3d 1070, 1076 (9th

Cir. 2002) ("In order to retaliate against an employee for his

speech, an employer must be aware of that speech.").   The issue

of retaliatory motive involves a question of fact.   Eng, 552 F.3d

at 1071.   Still, in Keyser v. Sacramento City Unified Sch. Dist.,

265 F.3d 741 (9th Cir. 2001), the Ninth Circuit held that summary

judgment as to the plaintiff's First Amendment retaliation claim

was appropriate where there was no evidence that the employee's

supervisor was aware that the employee had leveled charges of

misusing public funds against him until after the lawsuit was

filed.   Id. at 751.

In the case at bar, in addition to making the

statements to Chinen and at the two meetings, Plaintiff voiced

complaints to various individuals regarding allegedly illegal

practices at the SHPD.   Chinen contends that those complaints

were not substantial or motivating factors in the decision

against renewing his employment because she was unaware of those

statements before the decision was made.   Chinen's Mem. 13–21.

21

To begin with, Plaintiff alleges that he made statements to a union representative, the Hawaiʻi Legislature, and Robert Masuda. 3d Am. Compl. ¶¶ 48-50, 144, 150.  However, he has acknowledged that these statements were made after the decision was made not to renew his employment.  Chinen's Mot. Am. CSF ¶ 23; Pl.'s Opp'n CSF ¶ 23; 3d Am. Compl. ¶¶ 144, 150.  Hence, the statements could not have been substantial or motivating factors in the decision.

In addition, Plaintiff alleges that he made statements regarding unethical and illegal practices at the SHPD to:  (1) an auditor from a private accounting firm that was performing an audit of the SHPD; (2) a co-worker by the name of Sunny Greer; (3) individuals in a leadership class he took at the University of Hawaiʻi; (4) "[v]arious people in the community" and "many friends"; and (5) Dr. John Peterson, a former member of the advisory council on Historic Preservation.  3d Am. Compl. ¶¶ 42-47, 51-59, 105-06, 143, 152, 153.  Chinen has indicated that she was unaware of the statements before the decision was made not to renew Plaintiff's employment.  Chinen's Mot. Am. CSF ¶¶ 22, 27, 31, 35, 38.

Plaintiff concedes that he lacks any direct evidence showing that Chinen was aware of his statements prior to the decision.  See id. ¶¶ 21, 26, 29-30, 34, 37; Pl.'s Opp'n CSF ¶¶ 21, 26, 29-30, 34, 37.  Instead, he asserts that there is a reasonable inference that Chinen was aware of his statements to

22

third-parties by virtue of a memorandum she wrote regarding a

conversation she had with him during a meeting on June 1, 2006.

Pl.'s Opp'n 12; 3d Am. Compl. ¶¶ 47, 57, 59, 103, 106.  In the

memorandum, Chinen stated in relevant part as follows:

> **Purpose of Meeting:**
>
> This meeting was held to provide David Brown
> the opportunity to present the Administrator
> with an assessment of the work of the
> Archeology Branch, and to allow the
> Administrator to share concerns based on her
> observations and complaints received from the
> private regulated firms, Hawaiian community,
> and his subordinate staff.
>
> **Summary of Discussion:**
>
> . . . .
>
> I then asked Mr. Brown to give me his
> assessments of his relationships with his
> team members, the private archeology
> community and the Hawaiian community.  Mr.
> Brown reported he had great relationships on
> all three fronts and stated he constantly
> received positive feedback from the
> community.
>
> I explained that I had received complaints
> from all of his staff, the private archeology
> community, and the Hawaiian community.  I
> explained that the complaints stemmed from
> his changing policy single-handedly and
> inconsistently applying these changes.  I
> brought up the issue of requiring archeology
> inventory survey plans (ISPs).  Mr. Brown
> indicated it is required by the rules.  I
> asked is it a requirement or allowed?  He
> could not answer and stated he would need to
> read the rules.  I told Mr. Brown he could
> not make policy changes on his own and that I
> had constantly been reminding him of the need
> to discuss any proposed changes with me.  I
> explained that his professional staff felt

belittled by him and that their opinion did
not matter.  They had expressed to me that
they felt they could not offer their opinions
because he is perceived as doing things his
way only.  I explained that he could not be a
leader if his team refused to follow.

I informed Mr. Brown that I noticed a pattern
of letters coming in for my signature that
suddenly required inventory survey plans
(ISPs), but I could not determine what his
criteria was in ordering these plans.  I
asked him to explain what his criteria was.
Mr. Brown explained that he wanted to protect
burials so if burials had been found near the
site he automatically required an ISP.  I
asked him whether this had been discussed
with his staff which he answered in the
negative.  I explained that we have never
required ISPs and his doing so is a policy
change without proper authorization from me.
I also indicated I signed these letters
realizing that doing so may result in
complaints from the regulated community.  I
told him I signed off as [sic] these letters
as they have had been written over three
weeks ago without being processed by him.  I
signed off in the interest of time and
alerted his staff to the possibility of
incoming complaints regarding his change in
direction.  I told him that his staff were
advised that should they receive a complaint
they were to let the complainant know that I
would reconsider our letter and revise our
response if necessary.  I told him his staff
were already receiving complaints and that we
were having to revise letters.  I explained
that his action created additional work for
others, and caused the private archeology
community to view us with suspicion.  I
explained that no major policy change would
be made until the archeology workgroup
completed their monthly meetings and gave our
office a report of their recommendations in
streamlining the process and improving
archeology in Hawaii.  To make changes
without the workgroup's input discredits the
purpose of the group and would result in our

24

> not being taken seriously.  I reminded Mr.
> Brown that we are putting many financial and
> staff resources into the workgroup and that I
> am serious about this group.  Mr. Brown said
> he understood and stated he never thought how
> his decision could affect others including
> those sitting on the workgroup.  I also
> explained that his requirement for ISPs was
> not uniform making it look like we [were]
> arbitrarily and capriciously setting policy
> based on whose work we are reviewing.  I
> explained that this could result in personal
> liability as well as liability to [the]
> division.

Pl.'s Opp'n CSF, Ex. 101 at 1–3.  Based on these statements,

Plaintiff contends that there is a reasonable inference that

Chinen was in communication with many of the individuals with

whom he had voiced his complaints about the SHPD and that those

individuals disclosed the complaints to Chinen.  Pl.'s Opp'n 13;

Pl.'s CSF ¶¶ 57–59.

The Court disagrees.  To be sure, there is an inference

that Chinen spoke to the SHPD staff about Plaintiff and that the

staff reported the character of his comments.  See Pl's Opp'n

CSF, Ex. 101 at 2.  Those reports appear to have conveyed that

Plaintiff was condescending, not that he was speaking out on the

allegedly illegal practices at the SHPD.  See id.  Indeed, as

explained below, the only member of the SHPD staff who Plaintiff

has identified, and with whom Plaintiff allegedly raised his

concerns regarding illegal practices, is Sunny Greer, see 3d Am.

Compl. ¶¶ 42–47, and she testified that she did not disclose

those concerns to Chinen, Pl.'s Opp'n CSF, Greer's Dep. 98:11–15.

Furthermore, with respect to the complaints that Chinen received from private regulated firms and the archeology community, there is no indication that the complaints concerned statements by Plaintiff regarding the allegedly illegal practices at the SHPD.  Rather, the memorandum only references complaints that were made against, or, more precisely, were the result of, Plaintiff's unilateral changes in SHPD policy.  See Brown II, 2009 U.S. Dist. LEXIS 10546, at *35 n.3 ("[I]t would be unreasonable to infer that Chinen was aware of Plaintiff's complaints to his friends regarding illegal practices in light of her June 1, 2006 statement, because Chinen's statement concerned not the SHPD's illegal practices, but rather Plaintiff's changing policy single-handedly.").  Plaintiff's proffered inference is speculative at best.  See Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1065 n.10 (9th Cir. 2002) ("'We scrutinize the evidence and reasonable inferences to determine whether there is sufficient probative evidence to permit a finding in favor of the opposing party based on more than mere speculation, conjecture, or fantasy.'" (quoting O.S.C. Corp. v. Apple Computer, Inc., 792 F.2d 1464, 1466-67 (9th Cir. 1986)) (internal quotation marks omitted)).

The improbable character of the inference is further revealed by the facts surrounding Plaintiff's statements.  For one thing, the auditor to whom he spoke does not fall within the

classes of individuals from whom Chinen had received complaints.
Those groups were limited to private regulated firms, the
Hawaiian community, Plaintiff's subordinate staff, and the
archaeology community.  Pl.'s Opp'n CSF, Ex. 101 at 1-2.  They
did not include the accounting firm that audited the SHPD.  <u>See
id.</u>  Furthermore, the report that the auditor prepared does not
reflect any of the complaints that Plaintiff made to the auditor.
Chinen's Mot. Am. CSF ¶ 28; Pl.'s Opp'n CSF ¶ 28.[9/]  For another
thing, Plaintiff's statements to Greer, individuals in the
leadership class, "[v]arious people in the community," "many
friends," and Dr. Peterson were made in circumstances such that
he did not believe that the individuals would reveal his
statements.  <u>See</u> Chinen's Mot. Am. CSF ¶¶ 24, 33, 36; Chinen's
Mot. CSF, Ex. 10 at 57:4-23 (Pl.'s Dep.); Pl.'s Opp'n CSF ¶¶ 24,
33, 36.  Simply put, he made the statements in confidence.
Indeed, Greer confirmed in her deposition that, when she had
conversations with Plaintiff regarding his complaints, they had
an understanding that she would keep his statements confidential
and would not reveal them to Chinen.  Pl.'s Opp'n CSF, Greer's

---

[9/] While the Court is doubtful that Plaintiff made his
statements to the auditor at the SHPD as a citizen, and not as
the Branch Chief Archeologist, it does not have to address the
issue because it concludes that the statements were not
substantial or motivating factors in the adverse employment
action.

Dep. 98:18-25, 99:5-11.  Based on that understanding, she did not disclose the complaints.  Id. at 98:11-15.

Viewing the evidence in the light most favorable to Plaintiff, the Court nonetheless finds as a matter of law that Chinen was not aware of Plaintiff's statements to the auditor, Greer, individuals in the leadership class, various people in the community, many friends, and Dr. Peterson before the decision was made not to renew Plaintiff's employment.  Those statements were therefore not substantial or motivating factors in the decision. The Court will accordingly grant Chinen's motion for summary judgment, and the State Defendants' joinders therein, as to Plaintiff's First Amendment retaliation claim in Count I of the Third Amended Complaint insofar as the claim is premised on Plaintiff's statements to the union representative, the Hawai'i Legislature, Masuda, the auditor, Greer, individuals in the leadership class, various people in the community, many friends, and Dr. Peterson.  Having reviewed all of Plaintiff's statements and found that they were made pursuant to his official duties or were not substantial or motivating factors in the adverse employment action, the Court will dismiss his First Amendment retaliation claim in its entirety.[10]

---

[10] Because Chinen's motion for summary judgment as to Plaintiff's First Amendment retaliation claim will be granted on the ground that he has failed to establish certain essential elements, the Court need not address her contentions as to

(continued...)

## II.  Count II of the Third Amended Complaint:  NAGPRA

The Court will now address Plaintiff's motion for summary judgment as to Count II of the Third Amended Complaint. In that Count, he alleges that the State and Chinen violated a number of NAGPRA's policies and that the violations are ongoing under Thielen and McMahon.  3d Am. Compl. ¶ 164.  He asserts, among other things, that the SHPD is a "museum" under the statute, <u>see</u> 25 U.S.C. § 3001(8), and that the department has failed to comply with the statute's inventory requirements, <u>see id.</u> § 3005(a)(2).  3d Am. Compl. ¶¶ 166, 172.  He therefore requests state-wide injunctive relief enjoining the State, Thielen, and McMahon from violating NAGPRA.  <u>Id.</u> at 36.

Under the statute, a "museum" is "any institution or State or local government agency (including any institution of higher learning) that receives Federal funds and has possession of, or control over, Native American cultural items."  24 U.S.C. § 3001(8).  "Cultural items" include "human remains" and "associated funerary objects," which are

> objects that, as a part of the death rite or ceremony of a culture, are reasonably believed to have been placed with individual human remains either at the time of death or later, and both the human remains and associated objects are presently in the possession or control of a Federal agency or museum, except that other items exclusively

---

[10]/(...continued)
qualified immunity or her evidentiary objections.

> made for burial purposes or to contain human
> remains shall be considered as associated
> funerary objects.

Id. § 3001(3).  "[E]ach museum which has possession or control
over holdings or collections of Native American human remains and
associated funerary objects shall compile an inventory of such
items and, to the extent possible based on information possessed
by such museum . . . , identify the geographical and cultural
affiliation of such item."  25 U.S.C. § 3003(a).  The inventory
is "a simple itemized list that summarizes the information called
for by this section."  Id. § 3003(e).  It must, among other
things, be "completed in consultation with tribal government and
Native Hawaiian organization officials and traditional religious
leaders."  Id. § 3003(b)(1)(A).  "If the cultural affiliation of
any particular Native American human remains or associated
funerary objects is determined pursuant to this section, the
. . . museum concerned shall, not later than 6 months after the
completion of the inventory, notify the affected Indian tribes or
Native Hawaiian organizations."  Id. § 3003(d)(1).

In this case, Plaintiff contends that the State
Defendants have failed to comply with a number of the inventory
provisions, including those requiring a museum to create an
inventory and consult with Native Hawaiian organizations.  Pl.'s
Mem. 7-11.  The State Defendants agreed at the hearing that the
SHPD qualifies as a "museum" under NAGPRA.  See 25 U.S.C.

30

§ 3001(8).  Nevertheless, they contend that Plaintiff lacks standing to seek injunctive relief because he has failed to establish "injury in fact."  St. Defs.' Opp'n 4-5.  They insist that Plaintiff's interest in the preservation of historical artifacts is no different than that of the public at large.  Id. at 5.  "The 'irreducible constitutional minimum of standing' consists of three elements:  (1) injury in fact, (2) causation, and (3) likelihood that a favorable decision will redress the injury.  Plaintiffs bear the burden of establishing standing." Preminger v. Peake, 552 F.3d 757, 762-63 (9th Cir. 2008) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)). "[A] plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy."  Lujan, 504 U.S. at 573-74.  Here, the State Defendants do not dispute Plaintiff's claim that he is a professional archeologist dedicated to protecting historic sites, that he moved to Hawai'i in furtherance of that mission, and that he plans to continue his chosen career path working among the irreplaceable features and artifacts in Hawai'i.  See St. Defs.' Opp'n 5 (citing 3d Am. Compl. ¶¶ 167-68, 170).  They nevertheless contend that he has not adequately alleged an injury in fact.

31

The Court disagrees.  Plaintiff's assertions demonstrate that, if historic artifacts are lost as a result of the SHPD's allegedly improper inventory, he would suffer harm different in kind from the public at large, given that he is an archaeologist and that he continues to pursue his profession in Hawai'i.  The study of artifacts of Hawaiian origin is undoubtedly essential to his work.  See Ocean Advocates v. United States Army Corps of Eng'rs, 402 F.3d 846, 859-60 (9th Cir. 2004) (holding that a marine biologist, who studied orca whales in a certain geographic area and earned most of his income as a professional marine wildlife photographer, had established injury in fact where he claimed that the issuance of a permit allowing a petroleum company to build an addition to an existing oil refinery dock in the area violated environmental laws, as the addition would result in increased tanker traffic and a greater potential for an oil spill, which would have an adverse impact on orca whales).

The Court will now move on to the merits.  McMahon is the Deputy Administrator of the SHPD, the Archeology and Historic Preservation Manager, the State Archaeologist, and the Deputy State Historic Preservation Officer.  St. Defs.' Opp'n CSF, McMahon's Decl. ¶ 1.  As to Plaintiff's contention that the SHPD does not have an inventory, McMahon testifies that the SHPD has, and maintains, a complete inventory of human remains and associated funerary objects within its custody and has kept such

an inventory since approximately 1991.  <u>Id.</u> ¶ 3; <u>see also</u> St. Defs.' Opp'n CSF ¶¶ 1-5.  In addition, with respect to the Plaintiff's assertion that the SHPD has not consulted with Native Hawaiian organizations in compiling the inventory, the State Defendants have provided evidence indicating that the SHPD consults with Island Burial Councils regarding its repatriation of human remains pursuant to state law.  <u>See</u> St. Defs.' Opp'n CSF ¶ 14; <u>id.</u>, Lindsay's Dep. 101:8-102:12; Haw. Rev. Stat. § 6E-43.5(b) (explaining that regional representatives on Island Burial Councils must be "selected from the Hawaiian community on the basis of their understanding of the culture, history, burial beliefs, customs, and practices of native Hawaiians").  In view of this evidence, the Court finds that there are genuine issues of material fact as to whether the SHPD is currently violating NAGPRA's inventory requirements.  Plaintiff's motion for summary judgment as to his NAGPRA claim set forth in Count II of the Third Amended Complaint will be denied accordingly.[11]

---

[11] Because the motion will be denied, the Court need not at this juncture address the State Defendants' contention that the inventory requirements only apply to cultural items found on "tribal lands," which encompass "lands administered for the benefit of Native Hawaiians pursuant to the Hawaiian Homes Commission Act."  25 U.S.C. § 3001(15)(C).  The State Defendants have offered testimony on this point, <u>see</u> St. Defs.' Opp'n CSF, McMahon's Decl. ¶ 4, but they have not set forth a statutory analysis in support of their argument.  They should do so if they decide to advance this point in future proceedings.  In addition, the Court notes Plaintiff's contention that, because the SHPD is violating NAGPRA's inventory requirements, the department must
(continued...)

## CONCLUSION

In accordance with the foregoing, the Court:

(1)   GRANTS Chinen's motion for summary judgment, and the State Defendants' joinders therein, as to the First Amendment retaliation claim set forth in Count I of the Third Amended Complaint; and

(2)   DENIES Plaintiff's motion for summary judgment as to the NAGPRA claim set forth in Count II.

IT IS SO ORDERED.

Dated:   Honolulu, Hawai'i, September 23, 2009.

_____
Alan C. Kay
Sr. United States District Judge

Brown v. Hawaii, Civ. No. 07-00556 ACK-LEK:  Order Granting Chinen's Motion for Summary Judgment and the State Defendants' Joinders Therein and Denying Plaintiff's Motion for Summary Judgment

---

[11]/(...continued)
necessarily be violating certain repatriation requirements set forth in 25 U.S.C. §§ 3002(b) and 3005(a).  Pl.'s Mem. 11-13. The Court has found material questions of fact as to whether the SHPD is violating the inventory requirements and, as such, it will not consider the repatriation issue at this time.